## BLUM v. COMMISSIONER OF INTERNAL REVENUE.

### Nos. 10038, 10039.

United States Court of Appeals Third Circuit.

Argued Jan. 3, 1950.

Decided June 30, 1950.

Earl G. Harrison, Philadelphia, Pa. (Fred L. Rosenbloom, Thomas P. Glassmoyer, Philadelphia, Pa., Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., on the brief), for petitioner.

Melva M. Graney, Washington, D. C. (Theron Lamar Caudle, Assistant Attorney General, Ellis N. Slack, Special Assistant to the Attorney General, on the brief), for respondent.

Before BIGGS, Chief Judge, and MARIS and KALODNER, Circuit Judges.

KALODNER, Circuit Judge.

These appeals are from the decision of the Tax Court.

The question presented is whether periodical payments to the petitioner ("taxpayer") of a percentage of a manufacturing corporation's net sales of certain products were compensation taxable as ordinary income or whether they were consideration paid for the sale of several patents constituting capital assets and as such taxable as long-term capital gains.

The answer depends on whether the taxpayer "sold" the patents to the maker of the payments, Henry Disston & Sons, Inc., ("Company") or whether the patents already belonged to the latter and taxpayer was merely receiving commissions under the employment contract he had with Company.

The Tax Court held the patents involved were the exclusive property of the Company and that taxpayer's only interest was to receive compensation and accordingly the payments constituted ordinary income.

The facts found by the Tax Court[1] may be summarized as follows:

Taxpayer, an American citizen residing in Philadelphia, Pennsylvania, received a mechanical engineering degree in 1900 and worked as a mechanical engineer in Austria, Germany and Russia. He served with different companies, as engineer, in the manufacture of various kinds of mechanical products. He came to this country in 1913 and worked as a consulting engineer specializing in Diesel engines and electric melting plants.

In the early part of 1916, taxpayer was engaged by Company, a Pennsylvania corporation, as chief engineer and technical advisor. In this capacity he designed and supervised the construction of a steel plant with an electric furnace and was also engaged in all other branches of the Company's business. In 1925 or 1926, taxpayer was elected to the board of directors of the Company, which office he held until November, 1926. He was discharged as an employee of the Company early in 1926 as a result of friction between him and one of the vice-presidents of the Company.

In 1929, taxpayer went to Europe in search of machines and other mechanical devices which could be adapted for use in the American field. Among those located by taxpayer was a power chain saw, in which he became particularly interested because of its labor-saving possibilities. On his return to this country in January, 1932, he met the former president of the Company and, as a result, entered into a contract of employment with the Company and reported to it upon a number of products which he had located in his European travel which he thought the Company could manufacture at a profit for the American market.

Upon returning from Europe, taxpayer took up the work of attempting to adapt the various products above mentioned, including the Mafell type of chain saw, to the American market. Little progress was made and taxpayer became dissatisfied, believing that the Company should spend more money in the attempt to achieve the desired result. Finally, on March 31, 1933, taxpayer and the Company executed mutual releases from any and all obligations arising under their previous contract and on the same day executed a new contract of employment prepared by the attorneys of the Company and accepted by taxpayer who was not represented by counsel. This contract was in the form of a letter reading as follows:

"March 31, 1933.

"Mr. Arthur N. Blum
"Philadelphia, Pa.
"Dear Sir:

"You are hereby employed, beginning April 1, 1933, for one month, at a salary of $500.00 per month. You are to perform whatever duties are assigned to you by any of the executive officers of this company, and you are to give your full time and attention to those duties. You are also to be subject to any reductions in salary that the Board of Directors or the officers of the Company may see fit to make among the employes. This contract of employment shall continue from month to month but either you or the Company have the right at the end of any calendar month to give thirty days' written notice to the other that the contract is to terminate at the expiration of thirty days from the date when the notice is given and said contract shall, without further action, terminate at the expiration of the thirty days from the time the said written notice is given.

"In case this Company decides to manufacture and sell Chain Saws of the Mafell type, which are developed and made suitable for use in the United States through your own efforts or under your supervision, you are to be paid a commission equal to 2½% percent on the net sales price, when and as the money is received from the sales of the saws, for a period of five years, providing the Company continues to manufacture and sell the saws for that length of

1. Findings of Fact and Opinion of the Tax Court are reported in 11 T.C. 101,

time. If you secure a patent for and on behalf of the Company, then the commission is to continue during the life of the patent, providing the Company continues to manufacture and sell the saws for that length of time, it being understood that nothing in this letter is to bind the Company to manufacture and sell the said Mafell type of Chain Saws for any length of time.

"During the period of your employment any patent taken out by you in your own name or which may be assigned to you by any other person, that covers any of the articles that you may work upon for this Company, you will assign or undertake to get assigned to this Company, it being understood that any expenses incurred in obtaining such patents or assignments will be paid by the Company.

"This letter contains all of the compensation that is to be paid you for all of your services to this Company. There are no other understandings or arrangements between you and this Company except as is contained in this letter.

"If you approve of the terms and conditions of this letter, you will please signify your approval by signing your name after the words 'Approved and Accepted.'

"Very truly yours,
"Henry Disston & Sons, Inc.,
"By: (Signed) S. Horace Disston,
*"Vice President.*
"Approved and Accepted
"(Signed) Arthur N. Blum."

After the execution of the above contract, taxpayer's official title and duties were those of consulting engineer for the Company and he performed many routine duties. He worked on its plant and equipment and on new products submitted to the Company by outside parties. He worked in the Company's plant with facilities supplied by it and with assistance of its employees.

In trying to adapt the Mafell type chain saw for use in the American market, taxpayer got ideas for improvement of the chain saw and other items. Some of the work upon these ideas, which ultimately led to patentable inventions, he did at home and on holidays. On March 18, 1933, he

applied for a patent on a die for cutting puzzles and other cut-outs, and on June 27, 1935, he made application for a patent covering an improvement in plastic saw handles. Both of these applications were assigned by him to the Company at the time they were filed and patents were issued upon both of these inventions.

Taxpayer conceived certain inventions representing improvements on the Mafell type power chain saw and inventions on other articles of a non-chain saw type. On these the Company tried to induce him to file applications for patents and he advised the Company he would apply for patents only if a new contract were made. Finally, after extended negotiations, a new contract was entered into between him and the Company on January 25, 1939. This contract, in letter form, was prepared by the Company's attorneys and accepted by taxpayer who was not represented by counsel. This contract provided as follows:

"January 25, 1939
"Mr. Arthur N. Blum,
"Philadelphia, Pa.
"Dear Sir:
"In accordance with our discussions with you on January 5, 1939, we propose that effective as of January 1, 1939, the following modification be made in your letter of employment dated March 31, 1933.

"Instead of the commission of 2½% on the net sales price of Chain Saws of the Mafell type, sold, as provided for in said letter, we will pay you immediately upon acceptance of this modification of our agreement the sum of Three Thousand Dollars ($3,000.00), in consideration of the extra work you have done in developing a Power Chain Saw of this character.

"In addition to this sum of $3,000.00, and instead of the 2½% commission stipulated in our letter of March 31, 1933, we will pay you for a period of five (5) years, beginning with the date marking the completion of the sale of the first ten said Power Chain Saws, provided, however, that in no case will this date for the beginning of the said five year period be later than January 1, 1940, and providing also that the Company continues to manufacture and sell the said Power Chain Saws for that

length of time, which decision to manufacture and sell shall be at the sole discretion of the Company, a commission of 3½% on the net sales price, until commissions paid to you on this basis reach a total of $17,000.00, at which time the rate of commission will be reduced to 3¼%, on the net sales price, and continue at that rate for the remainder of the said five year period.

"In the event that any of the said Power Chain Saws are sold prior to the beginning of the five year period as established by the provisions of the preceding paragraph, you will also be paid a commission on them at the rate of 3½% on the net sales price.

"If you secure a patent or patents on said Power Chain Saw or any special feature or improvement thereof, for and on behalf of the Company, then, beginning with the ending of the five year period provided for above, we will continue the payment of commission to you for the life of said patent or patents at the rate of 3½% on the net sales price of said Power Chain Saws, providing the Company continues to manufacture and sell the said Power Chain Saws for that length of time, which decision to manufacture and sell shall be at the sole discretion of the Company.

"The Commission to be paid you will include not only the sale of the said Power Chain Saw itself, but also sales of all parts and accessories pertaining thereto, such as Chains and Guides, and the Grinding Machine specially designed to sharpen the teeth of the saw.

"It is understood that said commissions will be payable when and as the money is received from the sale of said Power Chain Saws and their accessories, and that payments will be made to you on or before the fifteenth (15th) of each month of the commission due you. for the preceding calendar month on this basis.

"As long as you continue in our employ you will be in charge of the organization and the development of manufacture and sales of the said Power Chain Saws and their accessories, up to the time when, in the opinion of the President of this Company, all major problems of production and sales have been solved, and the line established on a commercial basis as a going business. We may then, dependent upon the opinion of the President of this Company, decide to relieve you of the direct responsibility of supervising these functions, and transfer to the executives who may at that time be in charge of the Production and Sales Departments the responsibility for manufacturing and selling this product, and assign to you new duties.

"It is further understood that you will immediately make every effort to develop claims and apply for patents on any features of the said Power Chain Saw or accessories which you have developed, and which it is mutually agreed by yourself and this Company are of sufficient value to warrant the securing of a patent or patents. Should any patents be granted on any of these claims you agree that these will be assigned forthwith to this Company without any other compensation to you than that provided under this agreement.

"This letter is to be considered as a supplement to our letter of March 31, 1933, as accepted by you, and does not in any way change any of its terms and conditions, except as set forth above.

"If this modification of our agreement of March 31, 1933 is acceptable to you please signify your approval by signing your name in the place provided.

"Very truly yours.
"Henry Disston & Sons, Inc.,
"By: (Signed) S. Horace Disston,
"*Vice President.*
"Approved and Accepted:
"(Signed) Arthur N. Blum."

After the execution of the foregoing contract taxpayer made application for five patents. These applications were made in his own name and prepared and filed by the firm of patent attorneys which had long represented the Company.

Taxpayer did not assign to the Company any one of the five patent applications above referred to.

In 1940 the United States Government became very much interested in the chain saw, and taxpayer worked with the Army

Engineers at Ft. Belvoir, Virginia, in an effort to adapt the saw for military use. At that time the saw was electrically operated, but the Army Engineers desired one operated with an independent portable gasoline engine. Finally, a satisfactory gasoline engine for the purpose was developed in the United States, built according to specifications prepared by taxpayer and was successfully adapted to the chain saw.

Taxpayer was still dissatisfied with the policy of the Company with respect to providing capital for the production of the chain saws on a large scale and as a result of discussions with the Company an amendment to the existing contract was prepared by the Company's attorneys and accepted by taxpayer on March 28, 1941, reading as follows:

"March 28, 1941.

"Mr. Arthur N. Blum
"Hotel Normandie
"3467 Chestnut St.
"Philadelphia, Pa.
"Dear Sir:

"Referring to our recent negotiations, the following changes in the agreements between you and the Company dated March 31, 1933 and January 25, 1939, have been agreed to:

"1. Beginning February 20, 1941, to increase your salary from the present $500.00 to $600.00 per month, payable semi-monthly, with the understanding that you will continue to participate in the Salary Adjustment Plan on equal basis as other employees of Group No. 3. The amount of the Salary Adjustment will be figured on the salary only and not on any commission due under any of the agreements. Your employment to be heretofore on a monthly basis;

"2. Beginning February 20, 1941, to increase your commission on the net sales price (when received) of Power Chain Saws, parts and accessories thereto, to 10%, for a period of 5 years, as of January 1, 1941; or if you obtain a patent (or patents) and assign it (or them) to this Company, said 10% commission will be payable during the life of the patent (or patents). In the event that your employ-

ment is terminated before expiration of the above periods for payment of commissions, you agree that the 10% commission is reduced to 3½%.

"3. All other terms and conditions of our agreements dated March 31, 1933 and January 25, 1939, to remain in full force and effect.

"4. If you accept the terms and conditions as stated above, please signify it by signing your name after the words, 'Approved and Accepted'.

"Very truly yours,
"By (Signed) S. Horace Disston,
"*President.*

"Approved and Accepted:
"(Signed) Arthur N. Blum."

At the time the above amendment in the existing contract was made the five patent applications, heretofore referred to, were pending, and in 1941 taxpayer made two applications for patents on additional inventions.

Taxpayer resigned from his employment with the Company on December 31, 1941, and left work on January 5, 1942. At that time he had seven applications for patents pending and subsequent to his resignation he filed two additional applications for patents. Patents were issued on all of the nine applications, above referred to, during the years from 1942 to 1944, inclusive, and after the termination of taxpayer's employment.

The first chain saw embodying all of taxpayer's chain saw inventions was successfully tested in September, 1937, and the first two saws of this type were sold by the Company on November 7, 1940.

Five of the patents issued to taxpayer after his resignation on applications filed prior to such resignation, he formally assigned to the Company upon their issuance. The four additional patents issued to him upon two applications filed after the termination of his service and two prior thereto he assigned to the Company by assignments prepared by him, through his attorney, and forwarded direct by him to the Patent Office. The Company objected to the form of these assignments in the recitation therein that the assignments constituted a sale

of the patents to the Company. This dispute was finally adjusted by the filing in the Patent Office, in the case of each assignment, of a confirmation agreement executed by taxpayer and the Company in which it was agreed that the assignments were sufficient in law.

The Mafell type chain saw embodying the inventions made by taxpayer was very successful. Payments of percentages of net sales of saws and accessories were made to taxpayer under the contract, as modified March 28, 1941, as follows:

| | |
|---|---:|
| 1941 | $ 1,101.75 |
| 1942 | 11,821.75 |
| 1943 | 126,847.93 |
| 1944 | 188,284.79 |
| 1945 | 163,315.61 |

The Company on its books, prior to January, 1942, treated as a merchandising expense the payments made to taxpayer of percentages of net sales. Payments of this character made subsequent to that time were charged on the books to the merchandising account as a sales department expense. No part of these payments was capitalized by the Company but the entire sum in each year was treated by it as a deductible expense in determining net income subject to tax.

In his 1941 and 1942 returns, taxpayer treated as ordinary income the payments made to him on the basis of percentage of net sales but claimed the right to offset this by a deduction for depreciation on his contract on the basis that this was a capital asset. On his 1943 return taxpayer treated these payments as ordinary income and in his 1944 and 1945 returns he treated these payments as capital gain. At the time he filed his 1944 return he filed amended returns for 1942 and 1943 and a claim for refund for 1943, claiming that the contractual payments were capital gains, as representing the consideration for his sale of patents to the Company.

The instant appeals involve deficiencies in income taxes for the years 1943, 1944 and 1945 in the amounts of $3,166.07, $105,-582.25 and $89,301.50, respectively. Taxpayer claims overpayments for 1943 of $59,910.69 and for 1945 of $62.97.

On the assumption that a sale of the patents occurred, taxpayer further claims that he is entitled to a deduction for certain expenditures in connection with the assignment of the patents.[2]

The taxpayer has two arrows in his quiver in his attack against the Tax Court's determination. First, he contends that all three of the contracts above recited and the conduct of the contracting parties over a period of years establish that the parties never intended ownership of the taxpayer's inventions to vest in the Company until taxpayer obtained patents thereon and assigned them to the Company, and secondly, he vigorously urges that the 1941 agreement is the "basic" contract (executory in nature), and that it "rescinded and superseded all prior agreements" at least with respect to the payments received by the taxpayer during the taxable years under review here.

The Commissioner's position is that (1) under the taxpayer's employment contracts he was required to assign to the Company any patents he obtained covering his work for the Company; (2) the ownership of taxpayer's inventions and the patents obtained thereon was clearly vested in the Company and the patents could not be the subject of a sale by taxpayer; and (3) the commission payments were intended not as part of the sale price of the patents, but as additional compensation to taxpayer and as such constituted ordinary income.

The Tax Court, as was stated at the outset of this opinion, agreed with the Commissioner's contention that the Company and not the taxpayer was at all times the owner of the inventions upon which letters

---

2. The Tax Court held to be deductible the sum of $800 attorneys' fees paid by the taxpayer for legal advice as to his rights under his contract with the Company and $110 expended for travelling expenses, supplies and postage. It dis-

allowed legal fees paid by the taxpayer in connection with the assignment of his nine patents on the ground that since there was no "sale" of the patents, taxpayer had no cost basis from which to deduct the items claimed.

patent were issued and that the patents involved were the exclusive property of the Company. It premised its determination on its finding that (1) the evidence established that taxpayer's employment was covered by three specific interrelated agreements which were unambiguous; (2) the agreements combined the features of general employment and *employment for solving a particular problem;* and (3) the parties by their conduct during the employment and subsequent thereto, demonstrated that they treated the taxpayer's inventions and patents as the property of the Company.

It is plain that these appeals do not primarily involve a construction of the tax statutes or regulations and that fundamentally the question involved goes to the relationship between the taxpayer and the Company and the respective rights of each in the taxpayer's inventions and resulting patents, with the income tax consequences following as a matter of course upon determination of these rights.

We had occasion to discuss the legal principles applicable to the determination of these rights in Marshall v. Colgate-Palmolive-Peet Co., 3 Cir., 1949, 175 F.2d 215. Stated in capsule form they are as follows:

 A patent is property, title to which passes from the inventor only by assignment, and an agreement to assign will be specifically enforced; as between employer and employee rights are determined upon the contract of employment; absent a contrary understanding the mere existence of an employer-employee relationship does not entitle the employer to ownership of an invention of the employee even though the employee uses the time and facilities of the employer; if the employee is hired to invent or is assigned the duty of devoting his efforts to a particular problem, the resulting invention belongs to the employer and the inventor is bound to assign to his employer any patent obtained. United States v. Dubilier Condenser Corp., 1933, 289 U.S. 178, 189, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488; Standard Parts Co. v. Peck, 1924, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560, 32 A.L.R. 1033; Houghton v. United States, 4 Cir., 1928, 23 F.2d 386, certoriari denied 277 U.S. 592, 48 S.Ct. 528, 72 L.Ed. 1004.

We are of the opinion that the Tax Court correctly applied the principles above stated; that its conclusions of law and findings of fact are adequately supported by the record and that the taxpayer has failed to establish (1) error of law and (2) such clear error of fact as would require reversal.

 As we held in Commissioner v. Penn Athletic Club Building, 3 Cir., 176 F.2d 939, it is our function, under Rule 52(a) Federal Rules of Civil Procedure, 28 U.S. C.A.[3] merely to determine whether the Tax Court erred as a matter of law and whether its fact finding was "clearly erroneous". United States v. United States Gypsum Co., 1948, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746; Graver Tank Co. v. Linde Air Products Co., 70 S.Ct. 854.

It would serve no useful purpose to restate in detail the evidence, oral and written, on which the Tax Court premised its determination of the right to taxpayer's inventions and patents. That evidence was exhaustively detailed in the Tax Court's findings of fact and its opinion.

 It need only be said that the record abundantly demonstrates that the three letters relating to the taxpayer's employment were interrelated and constituted a single employment contract under which the taxpayer was not only employed to invent but was also specifically required to assign any patents obtained on his inventions to the Company;[4] that the commission payments provided in the contract were intended as additional compensation to the taxpayer for

---

3. Rule 52(a) was made applicable to the review of decisions of the Tax Court by Section 1141(a) of the Internal Revenue Code, 26 U.S.C.A. § 1141(a).

4. The letter of March 31, 1933, specifically provided that the taxpayer was to (1) assign all patents granted to him "that covers any of the articles that you may work upon for this Company" and (2) that "this letter contains all the compensation that is to be paid you for all your services to this Company."; the letter of

inventing and assigning, resulting patents and not as a consideration for the sale of patents and, finally that the taxpayer himself so interpreted the employment contract.[5]

For the reasons stated the decision of the Tax Court will be affirmed.

January 25, 1939 provided (1) it was a "modification" and a "supplement" to the March 31, 1933 contract of employment; (2) the taxpayer during his employment was to "be in charge of the organization and the *development of manufacture* and sales of the said Power Chain Saws and their accessories"; (3) "You (taxpayer) will immediately make every effort to *develop claims and apply for patents* on any features of the said Power Chain Saw or accessories which you have developed; and (4) "Should any patents be granted on any of these claims you agree that these will be assigned forthwith to this Company, *without any other compensation to you than that provided under this agreement"*;

the letter of March 28, 1941 provided (1) "The following changes in the agreements between you and the Company dated March 31, 1933 and January 25, 1939 have been agreed to" and "all other terms and conditions of our agreements dated March 31, 1933 and January 25, 1939 to remain in full force and effect."

5. The taxpayer left the Company on January 5, 1942. In his 1941, 1942 and 1943 income tax returns he treated the payments of commissions made to him by the Company as "ordinary income". It was not until he filed his 1944 return (in 1945) that he asserted therein that the commissions were payments received in consideration for the "sale" of the patents.