**JOY MANUFACTURING COMPANY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 11696.**

United States Court of Appeals Third Circuit.

Argued Nov. 17, 1955.

Decided Feb. 29, 1956.

Kalodner, Circuit Judge, dissented.

Harold R. Schmidt, Pittsburgh, Pa. (Don Rose, Rose, Rose & Houston, Pittsburgh, Pa., on the brief), for petitioner.

David O. Walter, Washington, D. C., (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before BIGGS, Chief Judge, and KALODNER and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

In determining a deficiency in the 1949 income tax of Joy Manufacturing Company, the Commissioner of Internal Revenue ruled that a disputed item of $120,277 constituted income accrued to the taxpayer during the taxable year for certain engineering services. The Tax Court sustained that ruling and the taxpayer has asked us to review the decision.

There is no serious disagreement about the essential facts as found by the Tax Court. Joy Manufacturing Company is a Pennsylvania corporation engaged in the manufacture and sale of mining and construction equipment and machinery. It maintains its accounts and computes its income on an accrual basis. Joy-Sullivan, Ltd., a British corporation, is the taxpayer's wholly-owned subsidiary doing business in Great Britain and Eire.

Some time prior to 1949 the two corporations had obligated themselves to each other by a contract under which the taxpayer undertook to furnish certain services and materials to Joy-Sullivan and in return Joy-Sullivan agreed to pay the taxpayer "as an engineering and service fee, a sum equal to 10 (ten) per cent of the cost of the products manufactured * * *." Thereafter, Joy-Sullivan found itself in continuing need of additional working capital, which it sought to borrow in London from Bankers Trust Co. However, the prospective lender wanted such additional security as would be afforded if the amounts payable to the taxpayer under the foregoing agreement should be used to increase the capital of its British subsidiary. At the same time, monetary restrictions enforced by the British government were impeding the transfer of funds from England to the United States.

Accordingly, before the beginning of the taxable year it was agreed by the taxpayer, Joy-Sullivan and Bankers Trust, with the required approval of the Bank of England for the British government, that, thereafter, for a period which included 1949, the obligation to compensate taxpayer for services and materials under the preexisting agreement should be discharged by the issuance of additional stock of Joy-Sullivan to the taxpayer. At the same time it was agreed that this capitalization arrangement should not preclude "nominal remittances" in the nature of "token payments" for services rendered. However, under the then existing British law each such transfer thereafter proposed would require an application to and approval by the Bank of England.

During 1949 the obligations incurred by Joy-Sullivan to the taxpayer, computed under the terms of the original contract, amounted to $120,277, the sum now in controversy. No part of this sum was then or ever transferred to the taxpayer. Rather, after the end of the taxable year, additional shares of capital

stock, of par value aggregating $120,277, were issued by Joy-Sullivan and delivered to the taxpayer in full settlement of the obligation arising out of the engineering and services contract.

The Tax Court also found that for each of the two years immediately following the taxable year the sum of £5000, about one-sixth of the contract value of the taxpayer's services rendered during the year, was actually paid to the taxpayer. Apparently this was accomplished by agreement of all concerned under the provision authorizing "nominal remittances", although there has been no finding on this.

■ We approach this problem by considering the income tax consequences of a simple agreement by a parent corporation to receive additional stock of its wholly-owned subsidiary in return for beneficial services to be rendered by the parent to the subsidiary. After such a transaction is fully executed, the parent has more shares of stock than before and the value of its holdings has been increased by whatever economic benefit the subsidiary has realized from the parent's services. But it is also true that before such a transaction, no less than after, all the stock of the subsidiary belongs to the parent. Therefore, the increase in the total value of the parent's stock caused by the parent's services is the same whether the subsidiary does or does not issue additional stock to the parent. In substance the services rendered by the parent have amounted to a capital contribution to the subsidiary.

The importance of this point seems to justify stating it again in a different way. While the services of the parent enrich the subsidiary, the additional stock or the promise of additional stock in subsidiary does not and cannot in any way enrich the parent. The parent obtains an economic advantage in the increased value of its wholly owned subsidiary, but the value is created directly by the par-

ent's services. It is not a realized gain and its character taxwise is not affected by the issuance of additional stock of the subsidiary. Here, as in the cases which apply the doctrine of Eisner v. Macomber,[1] the peculiar circumstances under which additional stock is issued to a stockholder prevent the promise or transfer of the additional paper from amounting to a realization of gain.

The Tax Court itself has recognized the soundness of this analysis. Josephson v. Commissioner, 1947, 6 T.C.M. 788; Jacksonville Paper Co. v. Commissioner, 1954, 13 T.C.M. 728. Cf. Michaels v. McLaughlin, D.C.N.D.Cal.1927, 20 F.2d 959. Indeed, in the Josephson case Judge MURDOCK, who also rendered the Tax Court decision from which the present appeal is taken, said, "He [the taxpayer] was the sole stockholder of the corporation. * * * His wealth was not increased by the issuance of the 200 additional shares. The issuance of such shares to him did not constitute income to him * * * regardless of whether it was stock dividend or for salary. * * *" 6 T.C.M. at 789. Similarly in the Jacksonville Paper case the Tax Court reasoned that "it seems to us that the amounts of * * * undrawn salaries [payable to the owners of a business] resulting in the issuance of additional capital stock * * * in proportion to * * original holdings, are in the nature of a stock dividend and, hence, not taxable * * *" We think it clear, therefore, that the issuance of additional stock to the sole stockholder for services rendered to a corporation, or the vesting of a right to such stock, does not result in the realization of taxable gain.

■ We next consider whether such a situation differs in any essential way from what was agreed and what was done in the present case. Here there were two transactions, an original service contract between a corporation and its sole stockholder and a subsequent

1. 1920, 252 U.S. 189, 40 S.Ct. 189, 64 L. Ed. 521, followed by this court in Wiegand v. Commissioner, 3 Cir., 1952, 194 F.2d 479. See particularly Helvering v. Sprouse, 1943, 318 U.S. 604, 63 S.Ct. 791, 87 L.Ed. 1029, involving a stock dividend to a sole stockholder.

multilateral agreement affecting the rights thereafter to be acquired under that contract. As a result of these agreements, when the stockholder rendered services to the corporation during the taxable year it received in return nothing of legal or economic significance except a right to additional stock.

To avoid the tax consequences of this conclusion the Commissioner analizes the stockholder's right to money under the original agreement as something distinct from the correlative obligation, superimposed by subsequent agreement, to accept stock in satisfaction of its claim. Relying upon that conceptual separation the Commissioner would treat the original agreement to pay money as the basis of a taxable accrual, ignoring the overriding obligation to accept stock in lieu thereof. This reasoning is unsound because both the original service agreement and the subsequent agreement to capitalize the value of the services antedated 1949 and were in effect throughout the taxable year. Whether we reason in two steps or in one the only enforceable claim acquired by the taxpayer for services rendered during 1949 was a right to receive stock. Therefore, the case differs in no essential way from the simple agreement to receive stock, the tax consequences of which we already have determined.

■■ There remains the matter of "nominal remittances." As already pointed out the general agreement to capitalize the engineering and service fee claims was qualified by a provision that token payments in money would be considered proper. However, it was not indicated in any way how large or small a sum would be regarded as a "nominal remittance." Moreover, as the Tax Court expressly found, any such payment to a non-British corporation would require an application to and approval by the appropriate public authority. Therefore, we think this permissive exception to the capitalization arrangement can reasonably be read only as an agreement in principle, subject to later determination of amount and governmental approv-

al of that amount. Moreover, no attempt was made to exercise that privilege for the taxable year. Instead, the entire claim was capitalized.

The rule with reference to the accruing of income in such circumstances is clear and well established. This court has stated it in the following language:

"It is 'the right to receive and not the actual receipt' of an amount which determines its accruability. But the right to receive must have become fixed before the right can be said to have accrued. Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 184, 185, 54 S.Ct. 644, 78 L.Ed. 1200. Consequently, until the right to an amount becomes accruable through the fixation of the right to receive, the taxpayer is under no obligation to return it as income. Otherwise he would be required to pay a tax on income which he might never have a right to receive." Keasbey & Mattison Co. v. United States, 3 Cir., 1944, 141 F.2d 163, 166–167. Accord, Commissioner of Internal Revenue v. Blaine, Mackay, Lee Co., 3 Cir., 1944, 141 F.2d 201.

In the present case, the taxpayer's privilege to arrange for token payments for 1949 services never became such a defined, unqualified and legally sanctioned claim as would afford the essential basis for the accrual of income for tax purposes.

For these reasons, the decision of the Tax Court will be reversed.

KALODNER, Circuit Judge (dissenting).

The crux of the majority's position is (1) during the tax year involved, 1949, " * * * the *obligation to compensate* taxpayer for services and materials under the pre-existing agreement *should be discharged by the issuance of additional stock* of Joy-Sullivan to the taxpayer"; and (2) " * * * the *issuance* of additional stock to the sole stockholder *for services* rendered to a corporation, or the

vesting of a right to such stock, does not result in the realization of taxable gain".

It is at once evident that (1) is a "finding of fact" and (2) is a "conclusion of law" premised on the specific fact-finding. I disagree with the majority as to both.

The majority's fact-finding that Joy-Sullivan's obligation to compensate taxpayer was to be "discharged by the issuance of additional stock", is in complete reversal of the Tax Court's fact-finding that Joy-Sullivan was required to *pay the petitioner* at the latter's option, *either in English pounds or in United States funds;* that during the year 1949 a total of $120,277 engineering fees accrued and became due to the taxpayer as compensation; that the compensation as it accrued constituted "income"; and finally, that the taxpayer did not use any of the accrued "income" to purchase stock until after the close of the taxable year.

The opinion of the Tax Court incontrovertibly establishes that it considered and rejected an attempt by the taxpayer to find as a fact that the obligation to compensate it for its services was to be discharged by the issuance to it of additional stock of Joy-Sullivan.

Said the Tax Court, 23 T.C. 1082:

The petitioner tries unsuccessfully to explain that " 'engineering fees' is a misnomer," they were "not actually fees" but only a "formula" to determine the appropriate number of shares of J-S stock to be issued to the petitioner which "was only entitled to stock, not money" and "hence petitioner had no taxable income based on such engineering fees." It then tries to shift the question of taxable income to the issuance of the stock, saying that the rule applicable here is that of Eisner v. Macomber, 252 U.S. 189, 40 S. Ct. 189, 64 L.Ed. 521, which stands "for the proposition that taxable income must be an *actual* gain or benefit derived by the taxpayer"; this case is precisely like a stock dividend (common on common) in which the taxpayer owns, after the dividend, only what he had before, evidenced by more pieces of paper; and "Once the September 27, 1948 commitment was made, petitioner could receive only more pieces of paper to evidence its already-existing 100% ownership of Joy-Sullivan."

That argument is unsound and does not go to the real issue in the case. The question here is not whether the petitioner received taxable income from the issuance to it of additional stock of its wholly-owned subsidiary. No stock was issued during this year and the Commissioner has not determined that the income arises from the later issuance of the stock but instead that it arose from the earning and accrual of the engineering fees during the taxable year. The engineering fees due from J-S to the petitioner, pursuant to their agreement, were fees in a correct meaning of the word, i.e. compensation or payment for services and privileges. They represented proper expenses of J-S and they were income, as they accrued, to the petitioner, an accrual basis taxpayer. United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347.

The petitioner, soon after acquiring the stock of J-S, decided to expand the operations of its new subsidiary to take advantage of the opportunities then present in Great Britain. It realized that J-S would need additional funds with which to operate on the larger scale. The petitioner did not choose, as it might have, to send its funds from the United States to Great Britain either as subscriptions to capital stock or as loans, but sought other means of meeting the needs of J-S. It tried to have J-S borrow funds in England, found that the small capital of J-S limited the latter's ability to borrow, and decided to solve the problem by purchasing additional

stock of J-S with funds belonging to it which were already in England, the engineering fees then owed to it by J-S, and by assuring the creditor and the Bank of England through its subsidiary that it would use additional engineering fees, as they would accrue, for the same purpose until it had increased the outstanding capital stock of J-S to 250,000 pounds. The *agreement* whereby J-S was required *to pay the petitioner engineering fees was already in existence and was quite separate from the arrangements later made by J-S for obtaining loans from the Trust Company.*

\* \* \* \* \* \*

\* \* \* It is clear that the petitioner earned during the taxable year all of the fees involved herein; those fees as earned were accrued on the books of both J-S and the petitioner; they then belonged to the petitioner and represented taxable income to the petitioner on an accrual basis. The prior voluntary agreement of the petitioner to use those fees after they accrued for purposes desirable to it, the purchase of additional stock of J-S, thereby providing its subsidiary not only with necessary additional operating capital but also with the basis for needed credit, in no way relieved the petitioner of liability for income tax on the fees as they accrued. (Emphasis supplied.)

Time and again this Court has subscribed to the well-settled rules that (1) the Commissioner's determination is presumptively correct; (2) the fact finding of the Tax Court will not be reversed on appeal unless "clearly erroneous".[1] In doing so we followed the clear injunction in United States v. United States Gypsum Co., 1948, 333 U.S. 364, 394–395, 68 S.Ct. 525, 92 L.Ed. 746; United States v. Yellow Cab Co., 1949, 338 U.S. 338, 70 S. Ct. 177, 94 L.Ed. 150.

Far from establishing that the Tax Court's finding was "clearly erroneous" the record on the contrary amply supports it.

Article Fourth of the written "basic" contract between the taxpayer and Joy-Sullivan executed August 15, 1949, formalizing their unwritten contract, clearly provided that "Joy-Sullivan shall pay Joy \* \* \* *either in English pounds or in United States funds* \* \* \* as an engineering and service fee for the exclusive right to use and enjoy said 'confidential matter' and services \* \* a sum equal to ten percent (10%) of the cost of the products so manufactured \* \* \* "[2]

1. Commissioner of Internal Revenue v. Penn Athletic Club Bldg., 3 Cir., 1949, 176 F.2d 939; Blum v. Commissioner, 3 Cir., 1950, 183 F.2d 281, 287; Commissioner of Internal Revenue v. Thompson, 3 Cir., 1955, 222 F.2d 893, 895. See also Colonial Fabrics v. Commissioner, 2 Cir., 1953, 202 F.2d 105, 107.

2. "Fourth: Joy-Sullivan shall pay Joy, at the option of Joy, either in English pounds or in United States funds at its office in the City of Pittsburgh, Pennsylvania, United States of America, as an engineering and service fee for the exclusive right to use and enjoy said 'confidential matter' and services in the manufacture of the Licensed Products and parts, a sum equal to ten per cent (10%) of the cost of the products so manufactured; provided, however, that such sum shall not exceed seven and one-half per cent (7½%) of the selling price of such products so manufactured and sold by Joy-Sullivan. Joy-Sullivan shall keep records and books of account showing with accuracy and detail the cost of such manufacture and the selling prices received by Joy-Sullivan for such products, and such records and books of account shall be open to examination at all reasonable times by accountants to take excerpts from and make copies of any entries or details of such records. Joy-Sullivan shall furnish Joy with a report on or before the twentieth (20th) day of January, April, July and October of each year (the final report for each year shall be certified as correct by auditors for Joy-Sullivan), showing with accuracy and in detail the cost of such manufacture and the selling prices received by Joy-Sullivan for such products and, simultaneously with said report, shall pay Joy, as above hereinbefore provided, the amount thereby shown to be due."

Prior and subsequent to the August 25, 1949 written contract, Joy-Sullivan accrued, on its own books, the engineering fees for services as an account payable to the taxpayer and also claimed them as an "expense" deduction on its income tax return filed with government of Great Britain. While it is true that neither circumstance is controlling on the issue as to whether the engineering fees constituted "income" to the taxpayer, it cannot be gainsaid that they are of considerable evidential value as to the nature of the undertaking between Joy-Sullivan and the taxpayer and that they give substantial support to the Tax Court's fact-finding that they constituted "income".

As was stated in Pacific Magnesium, Inc., v. Westover, D.C.S.D.Cal.1949, 86 F.Supp. 644, 649–650, affirmed 9 Cir., 1950, 183 F.2d 584, where it was held that the gain to the taxpayer resulting from the release of its debt was not a contribution to the taxpayer's capital and where the District Court gave particular consideration to the conduct of the parties at the time the transaction under consideration took place:

> "In all cases of this character, the contemporaneous acts of the parties performed at the time when the effect of the transaction *on tax liability* was not uppermost in their minds should prevail over subsequent attempts to give to it a different interpretation." [3]

It may be noted parenthetically that in affirming the Ninth Circuit ruled that the issue as to whether a *capital contribution* resulted from the transaction there or was income, as held by the District Court, was a "purely factual one", citing Commissioner of Internal Revenue v. Jacobson, 1949, 336 U.S. 28, 51, 69 S. Ct. 358, 93 L.Ed. 477.

The fact-finding of the Tax Court that the engineering fees constituted "in-come" to the taxpayer is further buttressed by the following briefly summarized evidence:

In 1946 the taxpayer merged with the Sullivan Machinery Company ("Sullivan") and thereby acquired all the stock of the latter's wholly-owned subsidiary, Joy-Sullivan. At the time of the merger Sullivan had an arrangement, unwritten, with Joy-Sullivan under which the latter was to pay it engineering fees. The arrangement was continued with the taxpayer and was in effect when early in 1948 Joy-Sullivan entered into negotiations with the Bankers Trust Company ("Bankers") for a loan and was advised by Bankers that the Bank of England would not grant its required approval unless action was taken to increase Joy-Sullivan's capitalization. In August, 1948 Joy-Sullivan, following discussion with the taxpayer, sent an unsigned memorandum to Bankers requesting approval of a 50,000 pound loan (overdraft) conditioned on (1) the petitioner's making "an immediate substantial investment out of the *accrued engineering fees * * *"* and its continuing investment of the "major portion of *engineering fees as and when they accrue,* until the issued capital of Joy-Sullivan amounts to 250,000 pounds" and (2) permission to Joy-Sullivan to "remit at the present time 10,000 pounds of the *accrued engineering fees * * *"* (then totalling 44,000 pounds). On September 24, 1948 (six days before the beginning of the taxable year here involved) the Bank of England wrote Bankers authorizing the remittance to the taxpayer of "10,000 pounds *on account of accrued engineering fees* due to Joy Manufacturing Company" (the taxpayer) and approving the issue of additional stock by Joy-Sullivan to the taxpayer *"in reduction of the debt due on account of accrued engineering fees."* Significantly, in the same letter it was stated that "the Bank will raise no objection to the pro-

---

**3.** To the same effect see 17 C.J.S., Contracts, § 325. See also Restatement of Contracts, § 235(e) and Williston on Contracts, § 633 (Vol. 3, Rev.Ed.).

posed variation in the terms of the existing agreement between Joy-Sullivan Limited and Joy Manufacturing Company whereby the latter company will be *paid engineering and service fees* calculated on the basis of 10% of the cost of the products sold in lieu of 7½% on the net sales \* \* \* " provided that "only nominal remittances will be made to the parent company on account of *engineering fees, dividends,* etc." until issued capital of Joy-Sullivan was "built up to 250,000 pounds." (Emphasis supplied.)

Pursuant to the terms of the unsigned memorandum of August, 1948 and the Bank of England's letter of September 24, 1948, Joy-Sullivan during the fiscal year ended September 30, 1948, remitted to the taxpayer $40,275 on account of then accrued engineering fees and a like amount as dividends.

No remittance was made by Joy-Sullivan to the taxpayer during its 1949 fiscal year pursuant to Joy-Sullivan's commitment to Bankers Trust that "apart from token remittances to the Parent Company for the service and engineering fees, application to remit will not be made until there have been accumulated funds from such fees to increase the issued capital of the Company to a total of 250,000 pounds." [4]

However, engineering fees for the 12-month period ended September 30, 1949, amounting to $120,277, were shown on the books of Joy-Sullivan as an account payable to the taxpayer. Engineering fees continued to accrue in subsequent taxable years; $87,466 for 1950; $89,127 for 1951; $163,912 for 1952 and $218,288 for 1953. Remittances of engineering fees in the amount of 5,000 pounds were made in each of the taxable fiscal years 1950 and 1951.

It was not until May, 1950 that Joy-Sullivan took any action with respect to the $120,277 engineering fees which had accrued during taxpayer's 1949 fiscal year. At that time it issued 39,275 shares to taxpayer and transferred to its capital account from its liability (to taxpayer) account sufficient funds to pay for the stock. In January, 1951, Joy-Sullivan issued to taxpayer additional stock representing the balance of the engineering fees outstanding which had accrued during the 1949 fiscal period.

In my view the record affirmatively established that Joy-Sullivan was obligated "to pay" taxpayer either in English pounds or in United States funds certain sums as an engineering and service fee and that it does not sustain the majority's fact-finding that Joy-Sullivan's obligation to compensate taxpayer was to be discharged by the issuance of stock.

Since the taxpayer is on an accrual basis of reporting income the engineering fees, as they were earned, became taxable income, irrespective of when or how they were paid. That they were "paid" in subsequent taxable years by issuance of stock was without any more significance than if they had been paid "in kind" by delivery to taxpayer of merchandisable machinery, or "due bills" at English hotels, etc., etc. The circumstance that the taxpayer entered into a temporary agreement to "invest" the major portion of its "income", viz., the accrued engineering fees, in the capital stock of Joy-Sullivan did not and could not have any impact on its tax liability with respect to such income. It did not, as pointed out by the government, make any permanent change in its basic agreement as to "payment" of engineering fees. On the contrary, the "basic" written agreement calling for the payment of fees "in English pounds or in United States funds" was entered into with the approval of the British bank and monetary authorities concerned smack-in-the-middle, as it were, of the stock-purchasing arrangement. Both before and after the latter the petitioner was a "creditor" of Joy-Sullivan with respect to accrued engineering fees and that relation-

---

4. Exhibit 8–H, letter dated March 31, 1949, from the Bankers Trust Company to the Bank of England.

ship was without impact on its stockholder status.

As previously stated, the creditor relationship was evidenced by these undisputed facts: the taxpayer was a creditor of Joy-Sullivan having rendered services for which it was entitled to compensation; Joy-Sullivan recognized the relationship by entering on its books as an account "payable" to taxpayer, the engineering fees as they were earned. As Joy-Sullivan's creditor the taxpayer had a right to enforce its claim against it. When Joy-Sullivan issued its additional stock to taxpayer it actually transferred on its books from its "liability" account to its "capital account" sufficient sums to pay for the stock; the result was the same as if the debt had been paid in cash and the taxpayer had then paid to Joy-Sullivan the same amount for new stock. Taxpayer to the extent of the transaction stated, converted its rights from those of creditor to those of stockholder. Co-incidentally and simultaneously the capital of Joy-Sullivan was increased by the amount of the indebtedness which was converted into capital.

The majority has yielded to the temptation of over-simplification in regarding the transition from creditor to stockholder status as being without tax consequence because " * * * before such a transaction, (the transition) no less than after, all the stock of the subsidiary belongs to the parent" and "While the services of the parent enrich(ed) the subsidiary, the additional stock or the promise of additional stock in subsidiary does not and cannot in any way enrich the parent."

Although the majority, in developing this theory, conceded that the taxpayer " * * * obtains an economic advantage in the increased value of its wholly owned subsidiary", it ruled that because the increased value " * * * is created directly by the parent's services" that "It is not a realized gain and its character

taxwise is not affected by the issuance of additional stock of the subsidiary."

In support of its views the majority has at least impliedly relied on the "doctrine" of Eisner v. Macomber [5] and it called particular attention to Helvering v. Sprouse [6] "involving a stock dividend to a sole stockholder."

The majority has indeed carried the Macomber doctrine to the port of no return.

The Macomber doctrine is simply this —stock dividends, considering their essential character, are not income.

The rationale of the doctrine as spelled out in the Supreme Court's opinion is as follows, 252 U.S. at pages 208-212, 40 S.Ct. at page 193: " * * * the interest of the stockholder is a capital interest, and his certificates of stock are but the evidence of it. * * * They show * * * that he is entitled to a corresponding interest proportionate to the whole" (of the enterprise); a stock dividend " * * * is no more than a book adjustment" and "In order to make the adjustment, a charge is made against surplus account with corresponding credit to the capital stock account, equal to the proposed 'dividend'; the new stock is issued against this and the certificates delivered to the existing stockholders in proportion to their previous holdings. *This, however, is merely bookkeeping that does not affect the aggregate assets of the corporation or its outstanding liabilities;* it affects only the form, not the essence, of the 'liability' acknowledged by the corporation to its own shareholders, *and this through a readjustment of accounts on one side of the balance sheet only, increasing 'capital stock' at the expense of 'surplus'.*" (Emphasis supplied.)

The foregoing clearly demonstrates that the Macomber doctrine not only does not afford support to the majority's disposition but operates to demonstrate its error. In the instant case Joy-Sullivan

5. 1920, 252 U.S. 189, 40 S.Ct. 189, 64 L. Ed. 521.

6. 1943, 318 U.S. 604, 63 S.Ct. 791, 87 L. Ed. 1029.

did not, prior to the issuance of the additional stock to the taxpayer, increase its capital stock via a transfer from surplus. On the contrary, it increased its capital stock via a transfer from the liability side of the ledger to the asset side of the ledger. Specifically, Joy-Sullivan reduced its liability by $120,277 (to taxpayer) and added that sum to the amount of capital stock outstanding. As a result of that action there was an actual increase not only in the capital stock of Joy-Sullivan but an equivalent increase in the sum total of its assets—surplus and capital. Thus here there was no bookkeeping that does not "affect the aggregate assets of the corporation or its outstanding liabilities" nor was there a "readjustment of accounts on one side of the balance sheet only."

A final comment:

I do not think that it is an answer to say, as the majority has, that since the taxpayer was the sole stockholder of Joy-Sullivan that the additional stock it received did not "enrich" it. Would the majority have gone so far as to say that if the taxpayer had been paid in cash for its services by Joy-Sullivan that it did not derive taxable income because as sole stockholder of Joy-Sullivan it in reality already owned the cash with which it was paid and therefore gained nothing from the transaction which was really only a distribution to it in partial liquidation?

I think that the real difficulty with the majority's position is that it has disregarded the fact that the taxpayer here is being taxed, not as a stockholder of Joy-Sullivan, but as a creditor. The engineering fees as they were earned constituted a debt due by Joy-Sullivan to the taxpayer; since the fees were compensation to taxpayer they were income, as they accrued (in 1949) to the taxpayer, an accrual basis taxpayer.

For the reasons stated I would affirm the decision of the Tax Court.