## WELLINGTON PRINT WORKS, INC.
v.
### Eugene A. MAGID.
### No. 36404.

United States District Court
E. D. Pennsylvania.
June 15, 1965.

Franklin Poul, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for plaintiff.

Richard P. Brown, Jr., Ferdinand P. Schoettle, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant.

WOOD, District Judge.

This is an action for a permanent injunction to determine whether the plaintiff, a family-owned corporation, has an ownership interest in the inventions or

discoveries of the defendant, a member of the family, and a former employee of the plaintiff corporation.

On January 26, 1965, we granted the plaintiff's motion for a preliminary injunction conditioned upon the payment of $1,500.00 per month to the defendant until a final hearing.[1] The plaintiff declined to pay this sum,[2] consequently the injunction was never utilized. A final hearing was held from March 15 through March 18, 1965, and the parties were given additional time to submit suggested findings of fact and conclusions of law with an argument held on June 7, 1965.

*In limine*, it is important to a clear understanding of this case to describe the kindred relationship of the various parties involved. It is manifest from the record that ties of blood dominated the daily operations of the plaintiff company.

David B. Magid (D. B. Magid) is the father of the defendant, Eugene A. Magid. From 1955 to March 15, 1961, D. B. Magid was the principal and only shareholder of the plaintiff corporation. Eugene A. Magid was President of Wellington Print Works, Inc., (Wellington) from 1955 until March 15, 1961, and D. B. Magid was Secretary-Treasurer during this period.

On March 15, 1961, D. B. Magid became President of Wellington; Eugene was appointed Treasurer, and a younger brother, Robert P. Magid, became Secretary. This arrangement continued until March 21, 1962.

From 1955 until March 15, 1961, D. B. Magid owned 60% of the voting stock of Hartford Textile Corporation, (Hartford) also a family-owned company. The remaining 40% of the voting stock was evenly distributed among Eugene A. Magid, Robert P. Magid, Sidney H. Magid, and Rhoda Feldman, all children of D. B. Magid. During this period, Robert P. Magid was President of Hartford and Eugene A. Magid, Vice President, and Sidney H. Magid, Secretary-Treasurer.

Hartford is engaged in the business of converting textiles. It purchases raw materials in web form from a mill and forwards such materials to Wellington for processing. This processing consists of printing, embossing and laminating materials, such as plastic, on a service basis for Hartford. Following this operation Hartford markets and promotes the finished products.

On March 15, 1961, D. B. Magid entered into an agreement with his son, Robert P. Magid, whereby D. B. Magid sold 97½% of his shares in Wellington to Robert along with most of his shares in Hartford Textile Corporation, so that by January 2, 1962, Robert P. Magid was in control of both corporations. This transfer was not announced to other members of the family until June, 1962, and such transactions have precipitated another action in New York by members of the Magid family.

Wellington had been acquired by D. B. Magid in 1949, and he sent the defendant, Eugene A. Magid, to Wellington to be his "eyes" to protect the family's interests. As previously stated, Eugene was President until 1961 with no definitely defined duties except to sign checks, audit purchase orders and settle labor disputes. On March 15, 1961, he was informed by a telephone call from a bank that his title had been changed from President to Treasurer.[3]

It is readily apparent from the record that D. B. Magid exercised autocratic control of these corporations either by reason of his ownership interest or

---

1. The Court believed this to be equitable since the defendant had been discharged because of his refusal to assign his patent applications to the plaintiff, and he was unable to obtain employment while this litigation was pending.

2. The Court was informed of this fact in a most unusual manner. We received a *carbon copy* of a letter dated February 19, 1965, from the plaintiff's New York counsel to the defendant's attorney in Philadelphia.

3. Eugene A. Magid continued in this position until his discharge on July 31, 1964.

parental influence over his sons. In June of 1962, D. B. Magid reduced Eugene's salary from $25,000.00 to $18,000.00 while Eugene was in Europe. Upon his return from abroad Eugene spoke to Robert P. Magid who interceded on his behalf with D. B. Magid and Eugene's salary was reinstated to $25,000.00. These incidents illustrate the unconventional manner in which the corporate activities were maintained.

While employed at Wellington Eugene A. Magid apparently accounted to no one except his father. He set his own hours, and no one restricted his activities in the plant. Although Eugene was not a technically trained person he began to experiment with techniques for superimposing patterns on particular materials, and also, the laminating of the materials themselves.

During the year 1962, he began to devote considerable time to these experiments. Eugene submitted samples or "patches" of his work to his brother Robert and M. Danson, sales manager of Hartford. He also prepared diagrams of his inventions which reflected Wellington's machines. He also used Wellington's equipment and personnel to conduct his experiments which interrupted the normal assembly line production of the company.[4] The time that he spent in these endeavors was not confined to the daylight hours alone, and he frequently ran samples on the machines during the two later shifts at the Wellington plant.[5]

Initially, no one showed much interest in his samples until it became apparent that Eugene exhibited a natural talent in his inventive work. In fact, D. B. Magid expressed irritation when he was questioned by a son-in-law as to why Eugene was working such long hours. He said that if Eugene would stop playing around with the machines and do the work that he was supposed to perform, he could go home at a decent hour.

Hundreds of samples produced by Eugene were sent to the sales manager of Hartford and many of the new patterns produced by Eugene were sold. Of these numerous samples five particular discoveries which are the subject matter of this suit created great interest in Robert P. Magid. These five inventions had been submitted to Wellington's patent attorney for an opinion as to their patentability. He determined that three of the developments were patentable, and Eugene applied for patents on these discoveries.

In March of 1964, Eugene asked for commissions for the products which he had invented. Prior to this time he had not asked for any additional compensation for his inventive efforts. Robert declined to authorize these commissions and directed Eugene to assign the patent applications on the inventions to Wellington. Eugene refused and on June 23, 1964, Robert P. Magid proffered a contract of employment to Eugene which required him to assign any patent applications to Wellington and that any future inventions would be the property of Wellington.

Eugene then met with D. B. Magid who told him to sign the contract or be fired, and also, that he must assign his patent applications to the plaintiff. Eugene refused to meet these terms, and on July 31, 1964, he was discharged.

The law is clear that "absent a contrary understanding the mere existence of an employer-employee relationship does not entitle the employer to ownership of an invention of the employee even though the employee uses the time and facilities of the employer * * *." Blum v. Commissioner of Internal Revenue, 183 F.2d 281, 287 (3 Cir. 1950). However, if the employee does use his employer's time and facilities, the employer is entitled to a shop right in the invention. Pressed Steel

4. During the period from November, 1963, to May, 1964, Eugene A. Magid used 210½ hours of Wellington's machine time for his experiments.

5. Wellington operated three shifts 24 hours a day.

Car Co. v. Hansen, 137 F. 403, 410, 2 L.R.A.,N.S., 1172 (3 Cir. 1905) cert. denied 199 U.S. 608, 26 S.Ct. 749, 50 L.Ed. 331 (1905); Kinkade v. New York Shipbuilding Corp., 21 N.J. 362, 122 A. 2d 360, 61 A.L.R.2d 348 (1956). Such a shop right "passes from the employee to his employer *immediately* upon the making of the invention by the employee * * *." (Emphasis Supplied) In re Hobbs, 136 U.S.P.Q. 489, 497 (1963). A shop right is limited to a non-exclusive right in the employer to practice the employee's invention. United States v. Dubilier Condenser Corp., 289 U.S. 178, 188, 53 S.Ct. 554, 77 L.Ed. 1114 (1933).

■ The record in this case compels the conclusion that no agreement either express or implied existed between the plaintiff and the defendant, whereby the defendant was obligated to assign his inventions to the plaintiff. We found no *credible* evidence which reflects that the plaintiff had any arrangement whatsoever with the defendant.

■ However, we do conclude that because the defendant used his employer's time and facilities in developing these inventions that the plaintiff does have a non-exclusive license to practice them.

We reject the defendant's contention that because he experimented primarily on the late shifts that he was working on his own time and not Wellington's. When an employee receives a large salary of $25,000.00 a year and is an officer of a corporation his obligations do not cease at the close of normal business hours. Particularly is this true in a situation where the employer functions 24 hours a day. The method of production employed by Wellington in operating around the clock made the defendant's inventions possible.

■ The defendant has filed a counterclaim in this action asserting that the instant suit was maliciously instituted by the plaintiff to recover ownership of the defendant's ideas or patent applications. While we have concluded that the plaintiff has no ownership rights in these inventions, we do not find that Wellington was without any valid basis for bringing this action. Undoubtedly personal animosity does exist between Robert and Eugene as well as other members of the Magid family. However, in any family-owned corporation such discord becomes intense and disagreements often generate lawsuits. This fact alone does not militate against the right of the corporation to assert its claim to these inventions developed on its time and with its facilities.

The foregoing Opinion constitutes the Court's findings of fact and conclusions of law under Rule 52(a). We incorporate herein our findings of fact Nos. 1, 2 and 3 concerning jurisdiction as set forth in our prior opinion of January 26, 1965, dealing with the preliminary injunction.