UNIVERSITY PATENTS, INC.

v.

Albert M. KLIGMAN, Johnson & Johnson Baby Products Company and Ortho Pharmaceutical Corporation.

The TRUSTEES OF the UNIVERSITY OF PENNSYLVANIA

v.

JOHNSON AND JOHNSON BABY PRODUCTS COMPANY, Ortho Pharmaceutical Corporation and Albert M. Kligman.

Civ. A. Nos. 89–3525, 90–0422.

United States District Court, E.D. Pennsylvania.

April 17, 1991.

Kenneth L. Bressler, Lieberman Rudolph & Nowak, New York City, Howard D. Scher, Montgomery McCracken Walker & Rhoads, Philadelphia, Pa., Paul Martin Wolff, Williams & Connolly, Washington, D.C., for plaintiffs.

Thomas C. Morrison, Patterson Belknap Webb & Tyler, New York City, William J. Taylor, Jr., Taylor & Taylor, Philadelphia, Pa., for defendants.

## MEMORANDUM

WALDMAN, District Judge.

Plaintiffs, The Trustees of the University of Pennsylvania (the University) and University Patents, Inc. (UPI), commenced this action to recover royalties allegedly owed to them by defendants for a preparation for photoaged skin invented by Dr. Kligman and marketed under license by Johnson & Johnson (J & J), and to seek a declaration of ownership in the patent rights to this product.

Presently before the court is defendants' Motion for Summary Judgment premised on the absence of any demonstrated enforceable rights of plaintiffs in Dr. Kligman's discovery. The parties have engaged in considerable discovery and have filed voluminous briefs. Oral argument was held on March 27, 1991.

## I. PROCEDURAL HISTORY

On May 10, 1989, UPI filed a complaint, claiming that: (1) Dr. Kligman breached his employment contract with the University

and also breached its Patent Policy; (2) UPI, by reason of its agreement with the University, is a third-party beneficiary to the Patent Policy and to the employment contract with Dr. Kligman; (3) because of his wrongful concealment of the invention, Dr. Kligman holds the patent in a constructive trust for the benefit of UPI and the University; and, (4) Dr. Kligman's conduct constituted a tortious conversion of UPI and University property. UPI, relying on a service agreement with the University, also seeks a judgment declaring that UPI is the owner of and has the right to license the invention to third parties.

On January 22, 1990, the University filed a separate action, claiming that (1) J & J's conduct constituted a tortious interference with the employment contract between the University and Dr. Kligman; (2) Dr. Kligman breached his employment contract with the University, specifically Patent and Conflict of Interest Policies set forth in employee handbooks in 1977 and 1983; and, (3) Dr. Kligman and J & J conspired to deprive the University of its rights in the photoaging discovery. The University also claims that J & J failed to pay amounts due under the 1967 and 1975 anti-acne licensing contract.[1] The University seeks an accounting to ascertain the amounts due. Furthermore, the University seeks a judgment declaring (1) that the Kligman/J & J licensing agreement is null and void, and (2) that the University owns all rights and interest in the invention and patent in question. Finally, the University seeks punitive damages from J & J.

The actions filed by UPI and the University were later consolidated. On March 16, 1990, the court granted plaintiffs' motion to dismiss defendants' first counterclaim for tortious interference with contract. On May 7, 1990, the court denied plaintiffs' motion to disqualify defense counsel, but precluded defendants from using information obtained during counsel's *ex parte* contacts with certain persons affiliated with the University.

Defendants filed a motion to dismiss plaintiffs' complaint based on the statute of limitations. With this motion, defendants submitted seventy-one exhibits. Consequently, the court granted plaintiffs' Rule 56(f) motion to restyle defendants' motion as one for summary judgment and to permit the parties to take limited discovery. This discovery has been completed and the parties have submitted supplemental briefs and exhibits.

Defendants filed a second motion to dismiss premised upon the alleged non-enforceability of the agreement in question. The court also re-characterized this motion as one for summary judgment and permitted limited discovery. Supplemental briefs, replies, and sur-replies have been filed by the parties. The court denied defendants' motion to dismiss UPI's complaint on the ground that it lacked third-party beneficiary standing without prejudice to proffer this contention in an appropriate motion at the close of discovery.

## II. LEGAL STANDARD

In considering a motion for summary judgment, the court must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact, and whether the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Arnold Pontiac–GMC, Inc. v. General Motors Corporation*, 786 F.2d 564, 568 (3d Cir.1986); *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 472 (3d Cir.1985); *Wolk v. Saks Fifth Avenue, Inc.*, 728 F.2d 221, 224 (3d Cir.1984); *First Jersey National Bank v. Dome Petroleum Limited*, 723 F.2d 335, 338 (3d Cir.1983). Only facts that may affect the outcome of a case under applicable law are "material." *Anderson, supra* 477 U.S. at 248, 106 S.Ct. at 2510.

All reasonable inferences from the record must be drawn in favor of the non-moving party. *Anderson, supra* at 256, 106 S.Ct. at 2514. The movant has the

---

**1.** It appears that this claim, unlike the others, goes to Dr. Kligman's first invention.

burden of demonstrating an absence of genuine issues of material fact. *Gans v. Mundy,* 762 F.2d 338, 340 (3d Cir.1985); *United States v. Athlone Industries, Inc.,* 746 F.2d 977, 981–82 (3d Cir.1984); *Small v. Seldows Stationery,* 617 F.2d 992, 994 (3d Cir.1980). The non-movant then must identify evidence on which a verdict in his favor could be sustained. *Childers v. Joseph,* 842 F.2d 689 (3d Cir.1988).

### III. FACTS

The pertinent facts from the uncontroverted evidence and the balance of the record viewed in a light most favorable to plaintiffs are as follow.

On August 11, 1965, the then President of the University of Pennsylvania, Gaylord P. Harnell, appointed a Patent Policy Committee to meet and make recommendations to the Trustees of the University.[2] The committee consisted of five faculty members, one administrator and University counsel. The committee drafted a policy which was approved by the trustees in January 1966.

Under the policy, all inventions and discoveries resulting from work carried out on University time or at University expense were to be the property of the University. Specifically, the policy provides:

> The Trustees have declared it to be the policy of the University of Pennsylvania that any invention or discovery which may result from work carried out on University time or at University expense by special grants or otherwise is the property of the University. Patents on such inventions or discoveries may be applied for in any country by the University in which case the inventor shall assign his interest in the patent application to the University. The University will exercise its ownership of such patent, with or without profit, with due regard for the public interest as well as the interests of all persons concerned. Pro-

cedures for implementation of this policy shall be developed and promulgated by the President of the University.

This basic policy has remained unchanged since 1966. The procedures for implementing the policy, however, have been revised on several occasions. The parties have submitted the procedures as revised in 1973. *See* Deposition of Anthony Merritt, at 29.

As revised in 1973, the procedures make it clear that the policy was to apply to "all members of the staff of the University whether fully or partially affiliated." One of the primary features of the implementing procedures is the disclosure requirement which provides: "If a staff member believes he has made an invention or discovery that may be patentable he shall discuss the matter with the Director of Research Administration. The latter will recommend to the Vice Provost for Graduate Studies and Research whether or not the University shall file a patent application."

If after such disclosure the University decides to apply for a patent, two alternatives are to be considered. The University may arrange for a non-profit patent management organization ("PMO") to exploit the patent through the granting of licenses to commercial firms. If it appears more advantageous, the University may make such arrangements directly with a commercial firm. Finally, if the University decides that it is not interested in assuming the costs of the patent application, the inventor may apply in his own name and at his own expense. Under such circumstances the inventor shall grant to the University a royalty-free, irrevocable, non-exclusive license to make or use the invention for its own purposes.

Plaintiffs contend that the policy was first published and mailed to faculty members on February 25, 1966.[3] The policy was *summarized* in the 1969 Faculty and

---

2. *See* Affidavit of Charles C. Price, at ¶ 3. Mr. Price was appointed Chairman of the Department of Chemistry at the University in 1954 and was on the faculty until 1978.

3. Plaintiffs submit a letter from a part-time Lecturer to Mr. Murray. The letter was dated March 12, 1966 and referenced the President's Letter of February 25 and the attached publication. *See* Letter from Albert W. Friend.

Administration Handbook.[4] The policy was set forth in the 1977 Research Investigators' Handbook which was distributed to faculty members through the University's internal mail system. *See* Deposition of Anthony Merritt, at 40. The policy as well as new implementing procedures were disseminated in a revised Research Investigators' Handbook in 1983.

The University also had a Conflict of Interest Policy. Defendants contend that the policy was not enacted, or at least not disseminated, until 1983 when the revised Research Investigators' Handbook was released. Plaintiffs contend that the policy existed prior to that time but under a different name. It appears that, at least as of 1973, the Patent Policy Implementing Procedures contained a section captioned "Outside Consulting or Employment Agreements."[5] This section directs the faculty member to advise the Dean or Director of any potential conflict between the member's obligation under the University's Patent Policy and any obligation assumed in connection with outside employment. On or about March 8, 1983, the University issued a "Conflict of Interest Policy" for faculty members which restated relevant existing policy and further required its faculty members to disclose to the University, in advance, any research in their respective fields in which they wish to engage for any private enterprise and first to offer such opportunities to the University.

Dr. Kligman is an Emeritus Professor of Dermatology at the University of Pennsylvania and has been affiliated with the University since 1948. *See* Kligman Affidavit, at ¶ 16. Most of Dr. Kligman's scientific research has been funded through consulting agreements with various drug and cos-

metic companies, and performed at private research facilities, principally Ivy Laboratories and the Simon Greenberg Foundation. *See* Kligman Affidavit, at ¶ 7. Dr. Kligman established Ivy Laboratories in the 1950's and the Greenberg Foundation in March 1960. Neither have any affiliation with the University. *Id.* at 8, 10.

In the 1960's, while treating inmates at the Holmsburg Prison, Dr. Kligman discovered that Vitamin A Acid was an effective treatment for acne. In an effort to commercialize the invention, Dr. Kligman consulted J & J and later disclosed his discovery to the University.

Dr. Kligman presented his invention to J & J on or about August 3, 1967. *See* Affidavit of Harold L. Warner. Mr. Warner was a patent attorney for Johnson & Johnson from 1957 until February 1, 1976. Mr. Warner states that he discussed the University's Patent Policy with Dr. Kligman and stated that in his mind there was a question as to whether the Policy applied to this invention. Mr. Warner stated that Dr. Kligman maintained that the University had no claim to the invention because the bulk of the work was done on his own time and expense at Holmsburg Prison but that he intended to donate the royalties to the University because he was expected and wanted to help fund the Dermatology Department. Finally, Dr. Kligman agreed to notify the University and resolve any problems. Warner Affidavit, at ¶ 8; Kligman Affidavit, ¶ 27.

On August 24, 1967, Dr. Kligman wrote to Encel H. Dodge, who was then the Director of the Office of Project Research and Grants of the University. In the letter, Dr. Kligman states that he wished to bring to the University's attention his de-

---

**4.** Specifically, the handbook stated:

An extensive declaration of policy on inventions and discoveries that may result from research at the University has been adopted by the Trustees. In general, any patent arising out of research done at the University or at University expense is the property of the University, which exercises its ownership rights, with or without profit, with due regard for the public interest and the interests of all persons concerned. Inventions or discoveries made from other work is the property of the inventor.

Contracts concerning sponsored research usually contain special clauses relating to possible inventions or discoveries and the respective patent rights of the University and its personnel. This is true in research sponsored by public or private organizations.

The complete statement on the University's Patent Policy, as revised in January 1966, is in the Office of the Secretary, College Hall.

**5.** *See* the 1973 Patent Policy; Second Affidavit of Anthony Merritt, at ¶ 2.

velopment of a new topical preparation for the treatment of acne. Dr. Kligman also stated that the innovation is "probably not patentable since the active ingredient is a Vitamin A derivative." He further stated that the formulation was developed on his own time with personal funds. Dr. Kligman stated that he was negotiating about potential royalties with J & J, and that he had proposed a 3% royalty to be paid to the University for exclusive use by the Dermatology Department. On September 11, 1967, Mr. Dodge responded stating that, in his opinion, University policy did not prohibit such a royalty arrangement. Mr. Dodge also referenced Dr. Kligman's statements that the invention was probably not patentable and was developed entirely on his own time using his own funds.

Mr. Warner then drafted a three-way agreement which makes clear that Dr. Kligman was the sole owner of the acne invention and that the "University has relinquished its rights, if any, to J & J in the 'Kligman Acne Treatment.'" A patent ultimately issued for the acne invention on April 24, 1973. This patent was assigned to J & J which conducted voluminous tests and thereafter secured FDA approval. The drug was introduced into the market under the name Retin–A and proved to be an enormous success. J & J has profited and the University has received millions of dollars in royalties.

Mr. Warner drafted three subsequent agreements in accordance with his understanding that the University had acknowledged that Dr. Kligman could freely license inventions made on his own time and with his own funds. *See* Warner Affidavit, at ¶ 14. The University was not made a party to these agreements which included an agreement regarding a Vitamin–A Acid/Steroid combination drug and consulting agreements entered into in 1970 and 1972.

During the 1970's and early 1980's, Dr. Kligman invented a second method of using Vitamin A Acid to retard the effects of aging of the skin. This discovery was an outgrowth of his work with Vitamin A Acid for the treatment of acne. *See* Kligman

Affidavit, at ¶ 37. During the 1970's, he used Vitamin A Acid to treat acne among residents of the Riverview Home for the Aged. Dr. Kligman states that this work was conducted as part of his work at Ivy Laboratories. The plaintiffs allege that Dr. Kligman discovered and reduced to practice these inventions using University funds, facilities, hospital patients and staff.

In 1971, Dr. Kligman wrote to J & J regarding the new observations and in early 1974 he sent them a manuscript outlining his findings. *See* Kligman Affidavit, at ¶ 38, 42. At this time, J & J filed an Investigational New Drug Application with the FDA and thereafter filed a Clinical Trial Protocol outlining the studies that would be run. Dr. Kligman's wife, Dr. Lorraine Kligman, who is also a member of the University's Department of Dermatology, was involved in the studies.

On June 15, 1978, J & J agreed to sponsor Dr. Lorraine Kligman's studies of the affect of Vitamin A Acid on rhino mice exposed to ultraviolet radiation. The grant from J & J was paid to the Simon Greenberg Foundation. *See* Kligman Affidavit, at ¶ 44; Grant Letter from Dr. Gerdin, dated June 15, 1978. J & J sponsored other research in this project at Ivy Laboratories and the Simon Greenberg Foundation, including grants in 1980 and 1982. *See* Kligman Affidavit, at ¶ 49.

On August 28, 1981, Dr. Kligman filed a patent application for the photoaging preparation in his own name. Plaintiffs allege that this was in violation of the Patent Policy. Regarding the University, Dr. Kligman states:

"Although I had developed the photoaging invention on my own time and at my own expense, the application did not hide my affiliation with the University or the fact that University facilities were involved in a portion of the work. Thus, the application specifically stated that I was a member of the University's Dermatology Department. It also disclosed the existence of the animal studies conducted at the University (the ones conducted by my wife Lorraine Kligman pursuant to a Johnson & Johnson grant)

as well as a clinical study conducted at the University's Aging Skin Clinic."

*See* Kligman Affidavit, at ¶ 54.

At this time, news of the invention was carried in the popular press and was the subject of numerous magazine articles. *Id.* at 55, 56. Dr. Kligman began to discuss the discovery at various scientific lectures and conferences around the world. *Id.* at 57. Anthony Merritt, the University's Director of Research Administration, was aware of this publicity. He believed, however, that the product in question was merely a new adaption of the old preparation and therefore was covered by the 1967 agreement.

On July 18, 1984, with the patent application still pending, Dr. Kligman signed a licensing agreement with J & J. The new agreement declared that Dr. Kligman was the sole owner and was free to license the invention. The agreement gave J & J the exclusive right to make, use and sell the invention and had a favorable royalty rate for Dr. Kligman, which was on a sliding scale of 5%, 3% and 1% of U.S. sales.[6] Again, like all of the agreements which came after the first Retin–A agreement, the University was not made a party to the agreement.

Patent No. 4,603,146 issued in July 1986 for the photoaging discovery. Because Dr. Kligman filed the patent himself, his attorney claimed that small entity status entitled him to reduced filing fees. The patent application had been denied several times when, in May 1984, Dr. Kligman retained the services of another patent attorney, Mr. Schwarze. *See* Kligman Reply Affidavit, at ¶ 26. Because the licensing agreement was not yet signed, Mr. Schwarze prepared another small entity status application. Once the licensing agreement was signed, the small entity status had to be changed. Dr. Kligman waited until September 1986 to do this, and in January 1987, the Patent Office granted the change.

In June 1978, the University entered into an agreement with UPI which was amended and re-executed in August 1983 and again in September 1987. Under these agreements, UPI was required to provide certain licensing services for the University in exchange for a percentage of royalties to which the University became entitled because of rights it might acquire under its Patent Policy. UPI states that during the course of its relationship with the University it received over 322 disclosures from various University faculty members. *See* A. Sidney Alpert Affidavit, at ¶ 3.

Plaintiffs allege that in April 1988, UPI for the first time became aware of the new invention and thereafter notified the University of its existence. Plaintiffs allege that they spent a year trying to get Dr. Kligman to provide evidence that he discovered the invention independently of the University, but that he failed to produce any such evidence. Thereafter, UPI filed its action in this court.

## IV. ANALYSIS AND DISCUSSION

Defendants contend that the University can show no contractual obligation upon Dr. Kligman by which he was required to assign his rights in the photoaging invention to the University. Defendants contend that employment policies and handbooks generally are not binding under Pennsylvania law, that the Patent Policy in question is not binding, and that even if it is, it is not applicable in the context of the present dispute. Plaintiffs argue that the patent policy was binding and obligated Dr. Kligman to assign his patentable rights to the University.

Although "ownership" and "inventorship" are not identical for patent law purposes, they are related. Inventorship provides the starting point for determining ownership of patent rights. The true and original inventor must be named in the application for a patent and, absent some effective transfer or obligation to assign

---

**6.** The favorable royalty scale was due to the fact that the new Vitamin A Acid invention was to be marketed as a consumer product rather than as a prescription drug. In addition, because of

this fact, the new agreement was with Johnson & Johnson's Baby Products Company unlike the prior agreement with the Ortho Pharmaceutical Company, a J & J subsidiary.

the patent rights, the original inventor owns the right to obtain the patent. *See* D. Chisum, Patents § 22.02 (1990). Patents have the attributes of personal property and both patents and applications for patents are assignable. 35 U.S.C. § 261.[7]

Since a patent is a creature of federal statutory law, it may be transferred only in the manner provided by such law. *See* E. Lipscomb, Walker on Patents § 19:4, at 333 (3d ed. 1986). An assignment of a patent must be in writing. 35 U.S.C. § 261. The writing must show a clear and unmistakable intent to transfer ownership, *McClaskey v. Harbison–Walker Refactories Co.*, 138 F.2d 493 (3d Cir. 1943), and must be executed by the patentee or by the patentee's assigns or legal representatives. Lipscomb, *supra*, § 19:7.

An agreement to assign a patent or an interest therein is an executory contract which may be valid and enforceable. *Gas Tool Patent Corp. v. Mould*, 133 F.2d 815 (7th Cir.1943); *Thomas v. Thomas Flexible Coupling Co.*, 353 Pa. 591, 46 A.2d 212 (1946); Lipscomb, *supra*, § 19:15. An equitable assignee may sue in law for damages or in equity for specific performance. *See Blum v. Commissioner*, 183 F.2d 281 (3d Cir.1950); *Mississippi Glass Co. v. Franzen*, 143 F. 501, 506 (3d Cir. 1906). Since contracts to assign patent rights do not have a statutory basis, but rather have a basis in common law or in equity, they need not be in writing and they may be implied as well as express. Lipscomb, *supra*, § 19:16. "Implied contracts may arise from the circumstances surrounding a case, such as employment or confidential relationship." *Id.*

The present case arises in the context of an employment relationship.[8] As the Pennsylvania Superior Court stated "[t]he major body of law on an employer's and employee's respective rights in the inventive or creative work of the employee evolved in the nineteenth and early twentieth centuries during our nation's industrial revolution" and the "basic" rules are fairly well-settled. *Aetna–Standard Engineering Co. v. Rowland*, 343 Pa.Super. 64, 69, 493 A.2d 1375 (1985).

The general rule is that an individual owns the patent rights in the subject matter of which he is an inventor even though he conceived of the subject matter or reduced it to practice during the course of employment. *Chisum, supra* § 22.03. The "mere existence of an employer-employee relationship does not of itself entitle the employer to an assignment of any inventions which the employee devises during the employment." *Aetna–Standard, supra*, at 69, 493 A.2d 1375 (citing *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114 (1933)); *Marshall v. Colgate–Palmolive–Peet Co.*, 175 F.2d 215, 217 (3d Cir.1949). This is true even where the employee uses the time and facilities of the employer. *Colgate, supra*, at 217. Even where "one is employed ... to work in a particular line in which he is an expert, there is no inference that inventions which he makes while working belong to the employer." *Mosser Industries Inc. v. Hagar*, 200 U.S.P.Q. 608, 612 (C.P. Lehigh 1978) (quoting Restatement (Second) of Agency § 397, comment a).

To this general rule there are two exceptions and one limitation. First, an employer owns an employee's inventions if the employee is a party to a contract to that effect. Second, where an employee is hired to invent something or solve a partic-

---

**7.** 35 U.S.C. § 261 provides in pertinent part:

Subject to the provisions of this title, patents shall have the attributes of personal property. . . .

Applications for patents, patents, or any interest therein, shall be assignable in law by an instrument in writing. The applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for pat- ent, or patents, to the whole or any specified part of the United States.

**8.** State law, rather than federal patent law, generally governs ownership rights in patentable inventions, including the rights as between an employer and employee. Lipscomb, *supra*, § 22.03[4]; *see Aetna–Standard*, 343 Pa.Super. at 68, 493 A.2d 1375 (state court may determine "incidental and collateral issues of property rights in an invention").

ular problem, the property of the inventions of the employee related thereto belongs to the employer. *Standard Parts Co. v. Peck*, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560 (1924); *Colgate, supra,* at 217; *Quaker State Oil Refining Co. v. Talbot,* 315 Pa. 517, 174 A. 99 (1936); *Aetna Standard,* 343 Pa.Super. at 74, 493 A.2d 1375. *See also Chisum, supra,* § 22.03.

■■ Where an employee uses the time or facilities of his employer, the employer may have a non-exclusive and non-transferrable royalty-free license (that is, a "shop right") to use the employee's patented invention. *United States v. Dubilier,* 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114 (1933); *Gill v. United States,* 160 U.S. 426, 16 S.Ct. 322, 40 L.Ed. 480 (1896); *Solomons v. United States,* 137 U.S. 342, 11 S.Ct. 88, 34 L.Ed. 667 (1890); *see Chisum, supra.*

These basic principles were discussed by the Supreme Court in 1933 and have remained substantially unchanged:

> One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained. The reason is that he has only produced that which he was employed to invent. His invention is the precise subject of the contract of employment. A term of the agreement necessarily is that what he is paid to produce belongs to his paymaster. On the other hand, if the employment be general, albeit it covers a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent, the contract is not so broadly construed as to require an assignment of the patent. . . .

> Recognition of the nature of the act of invention also defines the limits of the so-called shop right, which, shortly stated, is that, where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master a nonexclusive right to practice the invention. This is an application of equitable principles. Since the servant uses his master's time, facilities, and materials to attain a concrete result, the latter is in equity entitled to use that which embodies his own property and to duplicate it as often as he may find occasion to employ similar appliances in his business. But the employer in such a case has no equity to demand a conveyance of the invention, which is the original conception of the employee alone, in which the employer had no part.

*Dubilier,* 289 U.S. at 187–89, 53 S.Ct. at 557–58.

■■ The courts of Pennsylvania will enforce express contracts to transfer patent rights which are clear and unambiguous. *See White Heat Products Co. v. Thomas,* 266 Pa. 551, 555, 109 A. 685 (1920); *Mosser Industries, Inc. v. Hagar,* 200 U.S.P.Q. 608 (C.P. Lehigh 1978).[9] In this case, there clearly is no express written contract to assign. The University's 1977 Research Investigators' Handbook included a standard "Patent Agreement" form and there was a "policy" that "all personnel who may be involved in research must execute a Patent Agreement." Dr. Kligman, however, never executed such an agreement

---

9. In *Mosser,* the employee entered into an agreement with his employer which provided for the assignment of the employee's rights and interests in any invention which he may conceive of during his employment. The court enforced the agreement but made it clear that such a remedy was available only where there is clear proof of a valid binding unambiguous contract:

> In an equitable action to compel the assignment of an invention of an employee to the employer, the employer must show by clear and convincing proof that (1) the invention was conceived by the employee while in the employ of the employer; (2) the assignment was governed by a valid, binding, and enforceable contract, unambiguous in its terms so as to warrant specific performance; and (3) all conditions and covenants concerning the assignment agreement were fulfilled. The policy of the law is to protect the rights of the inventor, and in furtherance of that policy the language of an assignment agreement must be clear and precise, displaying the unmistakable intention that the matters involved are within the contemplation of the parties.

200 U.S.P.Q. at 613 (citations omitted).

and it appears that he was not even requested to do so.

Rather, plaintiffs base their contract claim on implied contract [10] and unilateral contract theories,[11] relying on the University's Handbook and policies and the parties' course of dealing.

In the context of patent rights, the courts have been hesitant to "imply" contracts to assign. This reluctance is based on the "nature of invention"—it being the product of original thought:

> The reluctance of courts to imply or infer an agreement by the employee to assign his patent is due to a recognition of the peculiar nature of the act of invention, which consists neither in finding out the laws of nature, nor in fruitful research as to the operation of natural laws, but in discovering how those laws may be utilized or applied for some beneficial purpose, by a process, a device, or a machine. It is the result of an inventive act, the birth of an idea and its reduction to practice; the product of original thought; a concept demonstrated to be true by practical application or embodiment in tangible form.

*Dubilier,* 289 U.S. at 188, 53 S.Ct. at 557 (citations omitted); *White Heat, supra,* 266 Pa. at 554, 109 A. 685. The law regarding implied contracts to assign patent rights in the employer-employee context has developed primarily in two areas: (1) where the employee is hired for some particular reason, *see Standard Parts, supra,* and (2) where the employee holds a position of trust as to the employer. *See, e.g., Great Lakes Press Corporation v. Froom,* 695 F.Supp. 1440 (W.D.N.Y.1987) (president of corporation had legal duty to assign to corporation those patents he obtained during his tenure).

In *Standard Parts,* the defendant was employed to devise an improvement for the front spring of a Ford automobile. He succeeded, and took out letters patent, claiming the property thereunder. The employer sought to compel an assignment. The Supreme Court held that an agreement to assign could be implied from the terms of the contract of employment. Specifically, the Court stated:

> By the contract Peck engaged to "devote his time to the development of a process and machinery," and was to receive therefor a stated compensation. Whose property was the "process and machinery" to be when developed?
>
> The answer would seem to be inevitable and resistless—of him who engaged the services and paid for them, they being his inducement and compensation, they being not for temporary use, but perpetual use, a provision for a business, a facility in it, and an asset of it. . . .

*Standard Parts,* 264 U.S. at 59–60, 44 S.Ct. at 241.

These principles have been applied by the courts in Pennsylvania. In *White Heat, supra,* the Pennsylvania Supreme Court made clear that the "black-letter law" of employer and employee rights to a patented invention must be applied to the facts of a case with careful regard to the particular terms of the individual employment contract. The defendant in *White Heat* was hired as an expert in the use of silica but also designed and patented an abrasive grinding wheel. The employer sought to compel him to disclose his invention and to assign his patent. The Court held that "where the product of an inventive mind is sought to be appropriated under an agreement to assign to another, the language of the agreement must be clear and show an

---

**10.** Generally, implied contracts arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract. *Ingrassia Construction Company v. Walsh,* 337 Pa.Super. 58, 67, 486 A.2d 478 (1984) (citation omitted). "The intent of the parties to an implied in fact contract 'is inferred from their acts in light of the surrounding circumstances.'" *Id.* at 67 n. 7, 486 A.2d 478 (quoting

*Cameron v. Eynon,* 332 Pa. 529, 532, 3 A.2d 423 (1939)).

**11.** Generally, a unilateral contract is a contract wherein the offer does not invite a promissory acceptance but instead calls for the other party to accept by rendering performance. *See* Restatement (Second) of Contracts § 45 and comment a (1981).

unmistakable intention that the particular matter covered by the invention or patent is within the intention of the parties." 266 Pa. at 555, 109 A. 685.

The Court in *White Heat* found no such clarity in the agreement before it. The plaintiff was in the business of making products for use in building, and the defendant had contracted to assign to it any patents he received for inventions relating to brick-making. The abrasive wheel, the Court found, was not sufficiently related to building, and thus was outside the assignment contract. The Court found that the plaintiff did not even have an implied, irrevocable license to use the wheel where it was designed and its preliminary construction was done outside working hours and at another plant. *Id.* at 557, 109 A. 685.

In *Quaker State Oil Refining Co. v. Talbot*, 315 Pa. 517, 174 A. 99 (1936), defendant employee was hired upon an oral contract to design a specific oil dispensing drumhead for the plaintiff to manufacture. He designed the drumhead, but incorporated into it several devices which he had invented prior to his employment. Plaintiff sought to compel defendant to assign to it legal title to, and any patent application or patent for, the drumhead. The Court stated that "Where an employee by contract is hired to make a particular invention or solve a specific problem for the employer the property in the inventions of the employee belongs to the employer—the employee has sold in advance the fruit of his talent, skill and knowledge, to his employer, who is equitably entitled to it; in making such inventions or solving such problems the employee is merely doing what he was hired to do." *Id.* at 523, 174 A. 99.

In *Aetna–Standard Engineering Co. v. Rowland*, 343 Pa.Super. 64, 493 A.2d 1375 (1985), defendant was hired as an engineer by plaintiff. Sometime after his initial employment, he was instructed to develop a "plug mill receiving table" for a mill which was the subject of a special project. He received no pay increase upon his assignment to that project. After completing the table design, he signed a disclosure document as a joint inventor with his supervi-sor, and also signed an application for a patent. When plaintiff laid off defendant, it asked him to assign his interest in the patent to it. He refused.

Aetna sought to compel an assignment. The Court held that Aetna was not entitled to an assignment of the employee's invention. The Court reiterated the rules set forth in *Dubilier* and *Standard Parts* and noted that courts should be hesitant to imply agreements to assign:

[T]he mere existence of an employer-employee relationship does not of itself entitle the employer to an assignment of any inventions which the employee devises during the employment.

.       .       .       .       .

[A]n employee must assign his invention to his employer if he was hired for the purpose of using his inventive ability to solve a specific problem or to design a certain procedure or device for the employer; in such a case, the invention is the precise subject of the employment contract. Given the personal, intellectual nature of the inventive process, the courts must otherwise hesitate to imply agreements to assign.

*Id.* 343 Pa.Super. at 69–70, 493 A.2d 1375. As defendant was hired as a general staff engineer and was not recruited specifically to design the table, received no special compensation for his work on the project, and had no express agreement to assign any inventions he created during his employment, the Court would not imply an agreement from defendant's employment contract to assign his invention to Aetna. *Id.* at 75–76, 493 A.2d 1375.

Plaintiffs here rely primarily on the University's Patent Policy and the handbook in which it was articulated to establish an implied contract to assign. Defendants cite a number of cases in which courts applying Pennsylvania law have declined to enforce employer handbooks and policies "against the employer," and urge the court to "rule as a matter of law that employer policies and handbooks cannot constitute implied contracts as against employees." The question of whether an employee manual can create an employment

contract or can change the terms of employment has not been definitively answered in Pennsylvania. Most of the cases in the area involve discharged at-will employees who are claiming the existence of an employment contract.[12]

In *Richardson v. Charles Cole Memorial Hospital*, 320 Pa.Super. 106, 466 A.2d 1084 (1983), a discharged employee attempted to show the existence of an employment contract, claiming that the employee handbook created a definite term of employment. The handbook stated that it was the policy of the employer "to provide continual employment to all employees whose work proved satisfactory." The Court held that the employer's "unilateral act of publishing its policies did not amount to the 'meeting of the minds' required for a contract. The terms of the handbook were not bargained for by the parties and any benefits conferred by it were mere gratuities." *Id.* at 108–09, 466 A.2d 1084. *See also Wells v. Thomas*, 569 F.Supp. 426, 431 (E.D.Pa.1983) (University of Pennsylvania policies and procedures not legally binding on employee who was uncertain of their applicability).

In *Darlington v. General Electric*, 350 Pa.Super. 183, 504 A.2d 306 (1986), Judge Beck, in a concurring opinion, suggested that employee handbooks might be analyzed under unilateral contract principles:

> Provisions in a handbook or manual can constitute a unilateral offer of employment which the employee accepts by the continuing performance of his or her duties. A unilateral contract is a contract wherein one party makes a promissory offer which calls for the other party to accept by rendering a performance. *See* Restatement (Second) of Contracts § 45 and Comment (a) thereunder (1981). In the employment context, the communication to employees of certain rights, policies and procedures may constitute an offer of an employment contract with those terms. The employee signifies acceptance of the terms and conditions by continuing to perform the duties of his or her job; no additional or special consideration is required.

*Id.* 350 Pa.Super. at 212, 504 A.2d 306. This view, however, has never commanded a majority.

In *Martin v. Capital Cities Media, Inc.*, 354 Pa.Super. 199, 511 A.2d 830 (1986), *alloc. denied*, 514 Pa. 643, 523 A.2d 1132 (1987), the Court followed *Richardson* and rejected Judge Beck's unilateral contract analysis. In *Martin*, an employee handbook was delivered to all employees and contained a section entitled "standards of conduct." Plaintiff, a discharged employee, argued that the handbook created "just cause" terms under which an employee could be fired and that the at-will presumption was therefore overcome. The Court rejected plaintiff's argument, and found that a contract of employment can be created by a handbook only if it contains clear language that would allow a reasonable employee to regard the handbook as altering his at-will status. *Id.* at 221–222, 511 A.2d 830.

Subsequent Superior Court opinions apply the "objective intent" language. *See, e.g., DiBonaventura v. Consolidated Rail Corporation*, 372 Pa.Super. 420, 426, 539 A.2d 865 (1988) ("Our inquiry will consider the issue of whether or not a reasonable employee in [the plaintiff's] position would have expected the Agreement, policies, and manual that he cites in his amended complaint to provide him with a specific term of employment."); *Mudd v. Hoffman Homes for Youth, Inc.*, 374 Pa.Super. 522, 531, 543 A.2d 1092 (1988) ("Reading the handbook provisions as a whole, we do not believe a reasonable person in appellant's position would have interpreted it as converting appellant from an at-will employee to an employee with an indefinite contract who could never be dismissed without objective cause.").

The objective intent language, however, was only one aspect of the *Martin* decision.

---

**12.** Pennsylvania law has long provided that an employer has the right to discharge an employee who has no definite contract of employment for virtually any reason. *Geary v. United States Steel Corporation*, 456 Pa. 171, 319 A.2d 174 (1974); *Darlington v. General Electric*, 350 Pa. Super. 183, 504 A.2d 306 (1986).

The Court in *Martin* made clear that for a handbook to form the basis of a binding agreement, a valid offer and acceptance must be found:

> We believe that the holding in *Richardson,* supra, is more in keeping with the philosophy of the at-will presumption than is the line of cases finding contractual significance in handbooks.... *Richardson* held that handbooks are not contracts because they lack consideration. We need not analyze whether there is consideration here because we find that a reasonable employee in appellant's position would not have understood that in distributing the handbook, the employer intended to be legally bound.

*Martin,* 354 Pa.Super. at 212, 511 A.2d 830.[13]

In *Morosetti v. Louisiana Land and Exploration Company,* 522 Pa. 492, 564 A.2d 151 (1989), the Pennsylvania Supreme Court addressed the question of whether a company policy of severance pay created an enforceable contract right. The Court held that the severance policy was not enforceable and stated:

> A handbook distributed to employees as inducement for employment may be an offer and its acceptance a contract....
>
> Again, it is basic contract law that there must be more than a general awareness; there must be an intended, definite, specific offer before any offer can be accepted or any enforceable contract created. One cannot suppose that another made an offer, was willing to make an offer or intended sometime to do so. Minds, for contractual obligation, must meet upon definite, specific things....
>
> *See Richardson v. Charles Cole Memorial Hospital,* 320 Pa.Super. 106, 466 A.2d 1084 (1983).

*Morosetti,* 522 Pa. at 495–96, 564 A.2d 151.

Because the severance policy was not formally communicated to employees, the Court's language regarding distributed handbooks is technically dicta. Nonetheless, this is the only recent Pennsylvania Supreme Court decision addressing the employee handbook issue and it is clear that the majority cited *Richardson* with approval.

The court must apply traditional patent assignment principles with the more recent and controversial employee handbook concepts.[14] The employee handbook in question clearly was not communicated as a definite offer of employment. The 1977 Research Investigators' Handbook is a fairly detailed 110–page document describing the various policies and procedures involved in research at the University, including the Patent Policy. The first statement in the Handbook itself suggests that it is a "guide" rather than an enforceable legal document.[15]

---

13. To the extent that plaintiffs base their contention that Dr. Kligman's conduct in 1966 manifested an intent to be bound by the Patent Policy, it must be noted that they have been unable to ascertain what the accompanying procedures were at the time. Merritt Deposition at 29.

14. What little commentary exists in this area makes clear that employers are not advised to use handbooks to effect the transfer of rights in patentable inventions:

> For those employees who are most likely to be involved in work which will give them access to trade secrets or development of new products or processes, handbooks should not be used as a substitute for individual employment agreements to protect confidential business information. A handbook should not be used in lieu of an individual agreement under these circumstances because the enforceability of handbook provisions remains, in many

states, quite tenuous. The perameters of the implied contract and its enforceability have not yet been fully defined; thus to utilize the handbook to protect confidential business information is akin to performing surgery with a blunt instrument.

Garry & Blakley, *Employee Handbooks: An Implied Employment Contract Approach to Protecting Confidential Business Information?,* 14 Am. Intell.Prop.L.A.Q.J. 3, 11 (1986).

The dearth of cases in which employers seek to enforce handbook provisions against employees likely reflects the wisdom and ease of specifically incorporating any such provisions by reference in an express employment agreement.

15. The FOREWORD provides in pertinent part:

> In this Handbook are assembled, for the information of the researcher, University policies and procedures relating to the conduct of research. The researcher is unlikely to find inspiration in these pages; that he/she must supply.

In addition to a discussion of the Patent Policy and procedures, the Handbook contains a patent agreement form to be signed by personnel involved in research. The Handbook states: "It is the policy of the University that all personnel who may be involved in research must execute a Patent Agreement at the time of employment." Research Investigators' Handbook at 82. The Patent Agreement provides in pertinent part:

## UNIVERSITY OF PENNSYLVANIA PATENT AGREEMENT

IN CONSIDERATION of information and facilities for research made available to me by The Trustees of the University of Pennsylvania under a grant or contract with the Government of the United States, University sponsorship, or other sponsors, I hereby agree:

1. That I will promptly communicate to the Director, Officer or Research Administration, full information as to each invention, discovery and improvement conceived or first actually reduced to practice by me during my work under such grant, contract, or sponsorship.

2. That I will, if and when requested, either before or after leaving the employment of the University of Pennsylvania, execute all papers necessary to file application for patents on any such invention, discovery, or improvement, in any country, and will assign such application, invention, discovery, or improvement covered thereby, and the patents that may be issued thereon as directed in accordance with the established patent policy of the University of Pennsylvania and sponsors of research projects on which I may work.

WITNESS my hand seal, this ___ day of ___ 19__
WITNESS: _____ Signature_____
WITNESS: _____ Signature_____

The Handbook contained a second agreement form, captioned "Patent Agreement For U.S. Public Health Service Research And Training Grants," which was to be executed by "[a]ll persons who perform any part of the work under a grant or award from the Department of Health, Education, and Welfare."

Plaintiffs suggest that both forms were only required when the research was funded by the government. Mr. Merritt acknowledged that even the first form "was used primarily where people had federal funding." Deposition of Anthony Merritt, at 57. These agreement forms were left out of the 1983 Handbook because as Mr. Merritt states: "Federal laws changed. There was a uniform government patent policy implemented, Public Law 96517; and it was felt under the new law that these kinds of sign-offs weren't required for Federal grants." *Id.* at 63.

It is not clear whether the University ever enforced compliance with the policy that all personnel who may be involved in research execute a Patent Agreement, but it is clear that it never did so with any vigor. At Mr. Merritt's deposition he was asked whether he had any knowledge "as to whether anyone, other than people who had government grants, were asked to sign the document or documents that's contained on page 83?" He responded that he had "no such knowledge." There is no evidence that Dr. Kligman ever signed a Patent Agreement. Indeed, there is no evidence that he was ever asked to do so.

In addition to these forms, the University had an Invention Disclosure Form which it used after a faculty member had reported an invention to the research office. The invention disclosure form requires such relevant information as the title of the invention, the name of the inventor, the names of any sponsors, and certain key dates. The Instructions for Completing the form made the import of the document clear: "The Invention Disclosure Form is a legal document and requires a reasonable degree of care in its completion. There are parts of it which may be of extreme importance to the patentability of your invention and to the protection of rights under any patent which might issue related to your inven-

But we hope that this Handbook will serve as a useful traveler's guide on the researcher's road to the unknown in today's complex world. Bon Voyage!

tion." The faculty member is required to sign a statement which provides in pertinent part:

> To the best of my (our) knowledge, the information set forth above and in the attachments is true, correct and complete. I (we) understand that this information may be relied upon during the preparation, filing and prosecution of a patent application relating to the invention disclosed herein, and that the accuracy of this information may be important to the validity of any patent which may result from such application. I (we) understand that I (we) have a duty to disclose all information which is material to the examination of any application filed on the invention, and I (we) will, from time to time, update and correct this information during the pendency of this application.
>
> I (we) acknowledge that the invention was made pursuant to the University Patent Policy and agree to assign all right, title and interest in the invention to the University pursuant to the terms of the Patent Policy.

As a general rule, the University did not require the completion of Disclosure Forms at any time prior to actual disclosure. *See* Deposition of Anthony Merritt, at 12–14.[16] In the case of Dr. Kligman even this was not done. The University never requested that Dr. Kligman sign a patent agreement or disclosure form with regard to the acne or photoaging inventions.

16. Mr. Merritt testified that some Universities require employees to sign patent agreements at the time of employment. Deposition of Anthony Merritt, at 12. The evidence shows that prior to 1983, the University had a policy that employees involved in research should sign a patent agreement, but this policy was never enforced and eventually removed.

17. The policy states that any "invention or discovery" which may result from work carried out on University time or at University expense by special grants or otherwise is the property of the University.

18. Article IV of the agreement provides:

> JOHNSON shall review the "Kligman Acne Treatment" to determine whether any patenta-

In 1967, even after Dr. Kligman wrote to the Director of the Office of Project Research disclosing the acne invention, he was not required to sign a disclosure form. In the letter, Dr. Kligman had stated that the invention was probably not patentable and was developed on his own time. The University's Patent Policy, however, did not strictly turn on "patentability." [17] The agreement which was ultimately executed by J & J, the University and Dr. Kligman clearly evidences the possibility that a patent would emerge.[18]

The language of the Patent Agreement and Disclosure forms make clear that they were intended to be enforceable contracts. It cannot be said, however, that any reasonable person receiving the handbook, without more, would have understood himself to be bound by the terms of a form agreement he never executed.

Plaintiffs also cite Dr. Kligman's first letter to Mr. Dodge and his responses to deposition questions as evidence of his intention to be bound by the policy. Dr. Kligman testified that before Mr. Warner read the patent policy to him, he had no knowledge that this document existed. He testified that he sought a clarification of his position from Mr. Dodge who responded that the University had no rights in the initial discovery since it was not made on University time or at its expense.[19] He understood the policy not to apply to him because his modus operandi was to obtain independent funding and to conduct re-

ble inventions may reside therein. Should it be determined that a patentable invention is present in "Kligman Acne Treatment", then JOHNSON, at its own expense, shall use its best efforts, short of appeal, to obtain U.S. patent protection to any such invention. Kligman shall cooperate fully in securing patents drawn to "Kligman Acne Treatment Inventions" and in assigning all rights in such inventions and applications and patents relating thereto to JOHNSON with no further cost to JOHNSON other than actual expenses incurred.

19. Since Dr. Kligman agreed to receipt by the University of any royalties, there was no practical reason for the University to investigate or question whether its time or resources had in fact been utilized.

search at private facilities, principally at Ivy. Kligman Deposition at 7–9.

A fair reading of Kligman's letter to Dodge of August 24, 1967 suggests that Dr. Kligman decided gratuitously to assign any royalties to the University. *See* Kligman Afft. Exhibit 9. Since he states in the letter that he developed the anti-acne preparation "on my own time using personal funds" at a non-University facility, it is not reasonable to infer that Dr. Kligman proposed an assignment pursuant to the Patent Policy.

Dr. Kligman, however, also testified that he would be bound by the Patent Policy if he "came up with some patentable invention which arose out of work done on University time or using University resources" had he been "fully affiliated." Kligman Deposition at 14. Based at least in part on Mr. Dodge's response of September 11, 1967 to Dr. Kligman's letter, he contends that he reasonably believed he was exempt from the Patent Policy as a non-fully affiliated employee. Kligman Deposition at 13. No reasonable person reading that letter could conclude that Dodge was advising Kligman that he was exempt from the Policy. *See* Kligman Afft. Exhibit 10. Dodge specifically referenced Dr. Kligman's assurance that no University time or resources were expended on the discovery. Further, the Patent Policy makes clear on its face that it applies "to all members of the staff of the University whether fully or partially affiliated."

Even if there may have been an offer and acceptance, however, it is not clear that there was any consideration. *See Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 910–911 (3d Cir.1985), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986) (agreement to employ defendant for reasonable period of time provided adequate consideration for express agreement to assign patent rights).

In *Harsco,* as in most of the other handbook cases, a handbook provision was used in an attempt to recast the terms of an at-will employment arrangement. In such circumstances, the retention of the employee for a term and his continued performance of services may constitute adequate consideration. Here, although the parties cannot agree on Dr. Kligman's exact status,[20] it is clear that he was and is a tenured professor and thus not subject to the at-will rule. When a college grants a professor tenure, it is giving away its right to terminate the professor at will. *See Barger v. General Electric Company,* 599 F.Supp. 1154, 1161 (W.D.Va.1984). "The respective rights and obligations of employer and employee, touching an invention conceived by the latter, spring from the contract of employment." *Dubilier,* U.S. at 187, 53 S.Ct. at 557; *Colgate,* 175 F.2d at 217. Thus, the respective patent rights of the parties regarding Dr. Kligman's discoveries during his affiliation with the University must be analyzed in the context of a tenured employment relationship.

The unilateral conferral of a benefit on a tenured employee is not enforceable without additional consideration. C. Bakaly, Jr. and J.M. Grossman, The Modern Law of Employment Relationships § 3.2.1 (1989). It logically would appear therefrom that the unilateral imposition of a new obligation on such an employee would not be enforceable without such consideration. Even courts which have taken a liberal view of the applicability of handbook provisions have held that a handbook issued after the existence of an express or implied contract of employment is not binding in

---

**20.** Dr. Kligman states that he has never been a "full time" faculty member but instead has the status of "Geographic Part–Time." As such, Dr. Kligman states he was ineligible for University fringe benefits. Plaintiffs contend that Dr. Kligman is "Geographic Full–Time." The University's Deputy Provost, Richard C. Clelland, states that Dr. Kligman has always been a tenured Professor with the status of "fully-affiliated and partially salaried." *See* Clelland Affidavit, at ¶ 2. This meant that it was contemplated that

he would obtain compensation from sources outside the University. A memorandum from Barbara Johnson, a University Personnel Administrator, dated March 24, 1976, states that Dr. Kligman is only partially-salaried and as such is not eligible for University-paid health insurance or for University-matched contributions to TIAA and CREF. Plaintiffs suggest that the "status" distinction is irrelevant here because the Patent Policy was designed to apply to either class of faculty.

the absence of additional consideration. *See, e.g., Toth v. Square D Company,* 712 F.Supp. 1231, 1235–36 (D.S.C.1989); *Thompson v. Kings Entertainment Co.,* 653 F.Supp. 871, 875–76 (E.D.Va.1987).

The distinction between an express and an implied contract is merely the manner of expressing one's assent. 1 A. Corbin, Corbin on Contracts § 18. Consideration is required in either context. *Thomas v. R.J. Reynolds Tobacco Co.,* 350 Pa. 262, 266, 38 A.2d 61 (1944). *See also Kistler v. O'Brien,* 464 Pa. 475, 484, 347 A.2d 311 (1975) (additional consideration required for enforceability of written obligation imposed by employer and accepted by employee even two weeks after existence of oral employment contract).

Plaintiffs contend that by allowing Dr. Kligman to use the University's facilities and staff, the University provided consideration for his adherence to the Patent Policy. They particularly refer to his utilization of Dr. Lavker's time and a study he conducted of 200 University hospital patients. Pennsylvania courts define consideration as:

> "a benefit to the party promising or a loss or detriment to the party to whom the promise is made [citations omitted] as long as the promisee in return for the promise does anything legal which he is not bound to do or refrains from doing anything which he has a right to do, whether there is any actual loss or detriment to him or actual benefit to the promisor or not."

*Harsco,* 779 F.2d at 910 (quoting *TMA Fund, Inc. v. Biever,* 380 F.Supp. 1248, 1253 (E.D.Pa.1974), *aff'd mem.* 532 F.2d 747 (3d Cir.1976)). There is no evidence of record to show that unqualified access to the University's staff and facilities was available to Dr. Kligman as a condition of his employment with the University as a tenured professor. Indeed, the record contains virtually no explanation of the mean-

ing of Dr. Kligman's employment designation or evidence of the terms and conditions of his employment.[21]

Whether a contract was formed generally is a question of fact to be resolved by a jury. *Novosel v. Nationwide Ins. Co.,* 721 F.2d 894, 903 (3d Cir.1983); *Ingrassia Const. Co. v. Walsh,* 337 Pa.Super. 58, 66, 486 A.2d 478 (1984). Like most jury questions, however, it can be answered by the court when the meaning is so clear that a jury's verdict to the contrary would be set aside. *Scott v. Extracorporeal, Inc.,* 376 Pa.Super. 90, 103, 545 A.2d 334 (1988).

> "The question of interpretation of language and conduct—the question of what is the meaning that should be given by a court to the words of a contract, is a question of fact, not a question of law.
>
> . . . .
>
> We must bear in mind, however that this question of fact is like other questions of fact in this: it may be a question that should be answered by the judge rather than by the jury.
>
> [If] the evidence is so clear no reasonable man would determine the issue before the court in any way but one, the court will itself determine the issue."

*Scott, supra,* at 103, 545 A.2d 334 (quoting 3 A. Corbin, Corbin on Contracts (1960); *Darlington, supra,* 350 Pa.Super. at 195, 504 A.2d 306.

This is a close case, particularly in view of the manner in which the University conveyed its Patent Policy and its lax enforcement thereof. On the current record, however, the court cannot conclude that no jury reasonably could find that an implied contract to assign the patent in question was formed between Dr. Kligman and the University. There is evidence, however scant, from which one could find that Dr. Kligman was aware of the Patent Policy since August 1967 and manifested an intent to be bound by it. By emphasizing that the

---

**21.** The dearth of evidence in this regard may reflect the initial view expressed by defense counsel at argument that Dr. Kligman's continued receipt of salary constituted sufficient consideration. Plaintiffs argued that in the absence of consideration, the court could apply princi- ples of detrimental reliance. Detrimental reliance, however, requires an express promise to the promisee and cannot support an implied contract claim. *C & K Petroleum Products, Inc. v. Equibank,* 839 F.2d 188, 192 (3d Cir.1988).

initial discovery was on his own time and at his own expense in his letter to Mr. Dodge, Dr. Kligman may have led the University reasonably to conclude that he recognized the applicability of the Policy to any discovery achieved with the use of University resources. There is evidence that such resources were used with regard to the photoaging discovery and no evidence to refute the University's position that the placement of these resources at Dr. Kligman's disposal constituted consideration.

Accordingly, defendants' motion for summary judgment premised on the absence of a binding agreement as a matter of law will be denied at this time.

As noted, the question of whether UPI may have enforceable rights under an agreement to assign as a third-party beneficiary has been reserved. The court notes, however, that since 1950, it has been the law in Pennsylvania that to have standing to recover on a contract as a third-party beneficiary, the actual parties to the contract must express an intention that the third party be a beneficiary to whom the promisor's obligation runs in the contract itself. *Higgins Erectors & Haulers, Inc. v. E.E. Austin & Sons, Inc.*, 714 F.Supp. 756, 760 (W.D.Pa.1989); *Fizz v. Kurtz, Dowd, & Nuss, Inc.*, 360 Pa.Super. 151, 154, 519 A.2d 1037 (1987) (citing *Spires v. Hanover Fire Ins. Co.*, 364 Pa. 52, 56–57, 70 A.2d 828 (1950)). In *Spires*, the Pennsylvania Supreme Court stated:

> To be a third party beneficiary entitled to recover on a contract it is not enough that it be intended by one of the parties to the contract and the third person that the latter should be a beneficiary, but both parties to the contract must so intend and must indicate that intention in the contract; in other words, a promisor cannot be held liable to an alleged beneficiary of a contract unless the latter was within his contemplation at the time the contract was entered into and such liability was intentionally assumed by him in his undertaking; the obligation to the third party must be created, and must affirmatively appear, in the contract itself. The fact, therefore, that plaintiffs

would be incidentally benefitted would not give them a right to recover on the [contract].

*Spires*, 364 Pa. at 56–57, 70 A.2d 828.

That a third party is not expressly named as a beneficiary is not preclusive if the intent of the parties that certain third parties would be benefitted was otherwise clear from the language of the agreement. *See In re Matter of Gebco Investment Corporation*, 641 F.2d 143, 147 (3d Cir. 1981) (subcontractors had standing where terms of construction loan agreement made clear that proceeds were to be used for payment of subcontractors).